STATE OF NORTH CAROLINA v. LEONARD H. CUTSHALL

No. 38

(Filed 14 April 1971)

1. **Criminal Law § 26— plea of double jeopardy — order of mistrial in first trial — improper conduct of juror**

    Where a defendant's first trial for homicide ended in mistrial, without his consent, on the ground that a member of the jury had met with the defendant during a weekend recess, the defendant could not properly raise the plea of double jeopardy in his second trial for the same offense, the order of mistrial having been entered for the necessity of doing justice.

2. **Criminal Law § 26— double jeopardy — burden of proof**

    The burden is upon defendant to sustain his plea of double jeopardy.

3. **Criminal Law § 26; Constitutional Law § 34— double jeopardy — constitutional guarantee**

    No person can be twice put in jeopardy of life or limb for the same offense. N. C. Constitution, Art. I, § 17; U. S. Constitution, Amendment V.

State v. Cutshall

**4. Criminal Law § 26— when jeopardy attaches**

Jeopardy attaches when a defendant in a criminal prosecution is placed on trial: (1) on a valid indictment or information, (2) before a court of competent jurisdiction, (3) after arraignment, (4) after plea, and (5) when a competent jury has been empaneled and sworn.

**5. Criminal Law § 26— double jeopardy — mistrial in first trial**

A plea of former jeopardy will not prevail where the defendant's first trial had ended in mistrial for physical necessity or for necessity of doing justice.

**6. Criminal Law § 101— order of mistrial — misconduct of juror who met with defendant**

Trial court's findings of fact tending to support the inference that a juror had met with defendant during a weekend recess in the trial, *held* sufficient to support an order of mistrial on the ground that a juror had "been tampered with and would be unable to render a fair and impartial verdict."

**7. Criminal Law § 158— record on appeal — presumption as to evidence omitted**

In the absence of evidence in the record on appeal, it will be presumed that an order of mistrial was supported by sufficient evidence.

**8. Criminal Law § 159— record on appeal — order of mistrial not signed in term time — harmless effect**

The fact that an order declaring a mistrial was not signed in term time did not constitute prejudicial error, since the order was available in ample time for the defendant to prepare his case on appeal.

**9. Criminal Law § 160— additions to signed order of mistrial — harmless effect**

Various additions to a signed order of mistrial merely gave a meaning to a sentence which had evidently been clouded by an inadvertent omission and were not prejudicial to the defendant.

**10. Criminal Law § 101— mistrial for misconduct of juror — examination of juror**

In ordering a mistrial, the trial court was not required to examine the very juror whose alleged misconduct in meeting with defendant created the necessity for the mistrial.

**11. Criminal Law § 43; Homicide § 20— admissibility of photographs — illustration of testimony relating to cause of death**

Notwithstanding the defendant's admission that the homicide victim had died from a gunshot wound, photographs of the victim were properly introduced to illustrate the testimony of the examining physicians that the fatal bullet had entered the right side of the victim's neck and had exited on the left.

**12. Criminal Law § 42; Homicide § 20— homicide prosecution — admissibility of bloodstained clothing**

The bloodstained skirt worn by a woman who was sitting next to a homicide victim when he was shot, *held* admissible in the trial of defendant for the homicide.

**13. Criminal Law §§ 88, 169; Witnesses § 8— impeachment of testimony given on cross-examination — prejudicial error**

When defendant's son denied on cross-examination that he had ever made the statement that his father was in a certain town establishing an alibi for a homicide, it was reversible error to allow the State to offer testimony contradicting the son's denial, such testimony being incompetent and tending greatly to prejudice the defendant's defense of alibi on his trial for the homicide.

APPEAL by defendant from *Thornburg, S.J.,* at 28 September 1970 Session of MADISON.

Defendant was tried upon a bill of indictment which charged that on 30 January 1970 he "feloniously, wilfully and of his malice aforethought, did kill and murder Richard Jack Reeves."

The case first came on for trial before Judge W. K. McLean at the 25 May 1970 Regular Criminal Session of Madison. Defendant entered a plea of not guilty and a jury was duly chosen and empaneled. The case was submitted to the jury at about 5:00 o'clock p.m. on Friday, 29 May 1970, and after deliberating for about three hours without reaching a verdict, the jurors were permitted to go home until Monday, 1 June 1970. Defendant was at liberty on bond. When the court reconvened on Monday, Judge McLean withdrew Charles Goforth and declared a mistrial. The record shows an unsigned order dated 1 June 1970 in which Judge McLean found facts and ordered a mistrial. We quote pertinent portions of the order:

". . . On Monday morning the Sheriff reported to the Court that one Jack Thomas had advised him that he had made arrangements for Juror Charles Goforth to contact and talk with the defendant over the line in the State of Tennessee.

Upon the foregoing, the Court ordered the Solicitor to bring into court such evidence as he had bearing upon any contact that the defendant might have had with members of the trial jury. Thereupon the following witnesses were called by the State: Andrew Jack Thomas, Sheriff Roy Roberts, Lonnie Treadway, Mrs. Wanda Treadway, Mrs. How-

State v. Cutshall

ard Allen, Mr. Herbert Baker, Mr. Mac Boyd, and Mr. Troy Ramsey. At the conclusion of the State's evidence and prior to the time that Troy Ramsey testified, the defendant testified in his own behalf.

Upon the evidence offered by the witnesses above-named the Court finds the following facts, to-wit: that on Sunday afternoon, May 31, Andrew Jack Thomas, at the request of Lonnie Treadway in Thomas' truck, took Treadway and his wife to the home of Charles Wayne Goforth, a member of the trial jury in this case; that Treadway and his wife had requested Thomas to take them to see a child of the Treadways who lives with one Billy King; that they did not go to see the child but went to the Hipps Mountain along the highway which leads up Little Laurel from the State of North Carolina into the State of Tennessee; that the defendant, L. H. Cutshall, lives in a trailer which is near the North Carolina-Tennessee line, but on the Tennessee side of the State line; that Goforth's wife was driving the truck of Thomas during this trip; that Juror Goforth asked Andrew Jack Thomas to go to the home of L. H. Cutshall which was some 100 yards from where they had parked Thomas' truck and tell the defendant Cutshall that he wanted to see him; that there is a logging road leading from the main highway to the left as you travel north toward Greeneville down into the woods; that after Juror Goforth had requested Thomas to carry the message to the defendant, Goforth then proceeded down the road or path into the woods; that Andrew Thomas did go to the home of the defendant Cutshall and told him that Juror Goforth wanted to see him or words to that effect; that Thomas then left the home of Cutshall and went back where they had originally parked near, as the witnesses described it, the salt bin; that shortly the witness Thomas observed a black automobile pass within some 100 feet of him going down the same trail that Juror Goforth had theretofore gone down; that the defendant L. H. Cutshall is the owner of a black Oldsmobile automobile.

Upon the foregoing facts and circumstances, the court finds as a fact that the defendant L. H. Cutshall contacted the Juror Goforth along the logging road. The Court further finds as a fact that on the Sunday evening of the 31st between the hours of 6:00 o'clock and 7:00 o'clock p.m. that

Troy Ramsey along with Herbert Baker and Mac Boyd ate sandwiches in Henderson Cafe in Hot Springs, North Carolina; that the wife of Herbert Baker is a member of the trial jury; that Mrs. Howard Caldwell is a member of the trial jury and is a first cousin of Mac Boyd; that Ramsey and Baker both knew the defendant Cutshall; that Troy Ramsey and the defendant's sister married brother and sister.

Upon the foregoing, the Court concludes that the defendant wilfully and voluntarily contacted Juror Goforth; that the meeting or association of the witnesses Ramsey, Baker and Boyd with the defendant during the progress of the trial is and was conducive to a fraudulent verdict.

The Court further concludes that the Juror Goforth has been tampered with and would be unable to render a fair and impartial verdict.

It is now, therefore, ORDERED that Juror Goforth be withdrawn from the jury panel and a mistrial ordered.

This first day of June, 1970.

W. K. McLEAN
Judge Presiding"

Another order finding facts and declaring a mistrial, dated 1 June 1970, was signed by Judge McLean. The unsigned order dated 1 June and the signed order dated 1 June were identical except as follows: The unsigned order on the last page stated: "That on the Sunday evening of the 31st between the hours of 6:00 o'clock and 7:00 o'clock p.m., that Troy Ramsey along with Herbert Baker and Mac Boyd ate sandwiches in Henderson Cafe in Hot Springs, North Carolina." The signed order states that "on the Sunday evening of the 31st between the hours of 6:00 o'clock and 7:00 o'clock p.m. that Troy Ramsey along with Herbert Baker and Mac Boyd . . (illegible) . . L. H. Cutshall 11 (illegible) . . ate sandwiches in Henderson Cafe in Hot Springs, North Carolina"; There was also an obvious correction in the signed order in the misspelling of the name "Ramsey." This record is very confusing as to when the signed order was actually signed and filed. The following notation appears above the signed order: "ADDENDUM A—ORDER OF JUNE 2, 1970 OF JUDGE W. K. McLEAN, AS SAME APPEARED AS OF RECORD ON JANUARY 28, 1970," but the order itself indicates that Judge McLean signed

the portion of the order relating to the mistrial on 1 June 1970. The statement of case on appeal states that Judge McLean withdrew a juror and declared a mistrial on the 3rd day of June 1970. The order settling the case on appeal refers to an order entered on the 2nd day of June 1970. We can conclude only that the signed order was signed at some time after the adjournment of the 25 May Session of Court, but before 28 January 1971, when the case was settled on appeal.

Defendant excepted to the findings of fact and conclusions of law.

At the 28 September 1970 Session of Madison, defendant was again put on trial for murder in the first degree. The jury, pursuant to order of Judge McLean, was drawn from Buncombe County. Defendant at that time did not enter a plea of double jeopardy.

Before the State put on evidence defendant entered a stipulation that deceased, Jack Reeves, died as a result of gunshot wounds on or about the 30th day of January, 1970, between the hours of 11:00 p.m. and midnight.

The State's evidence pertinent to decision is summarized (except where quoted) as follows:

Blanche Gentry Cutshall testified that she was formerly married to defendant and that they had one child born to their marriage—Dewayne Cutshall, age 18. She was divorced from defendant in June 1969 and lived with her son a short distance from the State Line Service Station and Grocery, which she operated. She had known the deceased, Richard Jack Reeves, for 25 or 30 years, and began seeing him socially after her divorce. On the night of 30 June 1970 she had a "date" with deceased. He picked her up in his Ford automobile and they drove up on Hot Springs Mountain, visited Carlie Gunter, and then went to Greeneville, Tennessee, where they ate at a drive-in. Shortly before 11:00 o'clock they started back towards her home in North Carolina. Near the State line they passed her son, Dewayne Cutshall, driving in the opposite direction, so since her son was not at home, they decided to "ride around some more." She was driving at this time, and as they drove up on the road towards the home of Richard Jack Reeves, she noticed an automobile following them. She told Reeves about the following car and pulled over in front of his house, and slid down in the seat.

The car that had been following stopped and someone started shooting. Richard Jack Reeves fell over on her legs. She heard the other car start off and she raised up to see who it was. She recognized L. H. Cutshall, who was driving his black 1964 Oldsmobile. After the Oldsmobile left, she ran down to the Reeves home and told Jack's mother and niece that "L. H. has shot Jack." She denied, on cross-examination, that she had told police officers and her son that "to the best of my knowledge" the driver of the car was L. H. Cutshall. She stated that she had never expressed any doubt to her son about the identity of the person she saw on the night of the shooting. She also related an incident "sometime in 1969" when defendant had thrown a rock and hit the car of Richard Jack Reeves, and at that time "L. H. run back into the back room and got a shotgun . . . but Richard had gone on down the road when he got to the door with the gun."

Over defendant's objection, the State offered in evidence the skirt worn by Mrs. Cutshall on the night in question.

Dr. Otis Duck testified that he examined the body of deceased at the scene of the crime. Over objection he stated that deceased was killed by a bullet's severing the spinal column. Based on his observation of the wound he stated that the bullet entered from the right side and exited the left side of deceased's neck.

Dr. George R. Pacey, district pathologist under the Medical examination system, testified that he examined the body on 31 January 1970. His conclusions were consistent with those of Dr. Duck. The State offered to introduce several pictures taken of the body while it was being examined by Dr. Lacey. The court permitted only two of these in evidence. One showed deceased's hand, through which a bullet had passed. The other showed deceased's body looking from the top of the head toward the feet. A probe came through the neck following the path of the bullet, but the picture did not show the wound. In both pictures blood was evident. Dr. Lacey described the wound without objection from defendant.

Madgie M. Thompson testified that she was passing defendant's trailer home around 5:00 o'clock in the afternoon on 30 January 1970 and saw L. H. Cutshall putting a gun into the trunk of his black Oldsmobile. Her testimony was corroborated by that of her husband, Jimmy L. Thompson.

SBI Agent Howard Elliott testified that he talked with defendant on 31 January 1970. Defendant told him that he knew nothing of the shooting and that he did not loan his automobile to anyone on the night of 30 January 1970. In response to question as to where he was on that night, defendant replied, "he would prove that when the time came."

The State offered other witnesses whose testimony was cumulative and corroborative.

At the close of the State's evidence, defendant moved for judgment as of nonsuit. The motion was denied. Defendant then offered evidence which, in substance, was as follows:

Ray Ayers testified that he arrived at the Riverside Cafe in Newport, Tennessee, which is located about 50 or 60 miles from the place where the shooting occurred, at about 11:00 o'clock p.m. on 30 January 1970. Ayers stated that he saw defendant at the cafe when he arrived and that defendant was still there when he departed at 12:00 o'clock midnight. On cross-examination he admitted that he was a close friend of defendant, and that he did not testify at defendant's first trial because he was not subpoenaed.

Mrs. Martha Hillard testified that she arrived at the Riverside Cafe around 11:45 p.m. on the night in question and saw defendant at that time; that defendant was still there when she left around 1:00 o'clock a.m. on the morning of 31 January. She also stated that she did not testify in defendant's behalf at the first trial.

Dewayne Cutshall, son of L. H. Cutshall and Blanche Cutshall, testified that he saw his mother at a place about 13 miles from the scene of the crime at about 11:20 on the night of the homicide. She was driving away from Greeneville, Tennessee, and he was driving towards Greeneville. At that time she was not being followed by any automobile. He further stated that he did not see his father's automobile on that night. Dewayne testified that he heard his mother make a statement to investigating officers in which she said it was L. H. Cutshall who shot deceased to the best of her knowledge. He further testified: "I talked to my mother the following day about this matter. I went up to her and I said, mom, are you sure that it was my father. I said, are you sure? And she looked at me and she studied for a while and she said, I'm not sure, but I think it was; . . ."

Defendant presented other witnesses whose testimony is not pertinent to decision in this case.

The State in rebuttal recalled Dewayne Cutshall, who testified that he was with Sheriff Roberts during the preliminary investigation on the night of the shooting. The Solicitor asked the following question: "I'll ask you if you didn't tell him to go over to Newport to this drive-in that he would find your daddy over there getting his alibi?" Dewayne denied that he made this statement.

The State then recalled Sheriff Roy Roberts who, over defendant's objection, testified that he heard Dewayne Cutshall say that defendant would be at Riverside making up alibis.

Blanche Cutshall was recalled, and she testified, over defendant's objection, that she heard Dewayne state in the Sheriff's presence that the defendant was probably at Newport establishing an alibi.

Bobby Stinson was called as a rebuttal witness. He testified that on 30 January 1970 he was a deputy sheriff in Cocke County, Tennessee, and that in connection with his duties he received a call with respect to L. H. Cutshall. Pursuant to the call he went to Riverside Truck Stop near Newport, Tennessee, between the hours of 12:30 and 1:00 o'clock. He stated that he did not see the defendant L. H. Cutshall there and that he had a description of his automobile and was unable to locate the automobile there. On cross-examination, the following occurred:

". . . I didn't check the register and didn't find out that L. H. was registered there that night, or that he could have been in one of the rooms.

Q-17: Well, you don't deny that he was, do you?

Objection. Overruled. I'm going to let you answer that.

A. I'd have to use hearsay.

COURT: All right.

A. The man that was supposed to have registered them in up here, Cod Lock . . .

COURT: I mean just listen to the question.

Q-18: Just answer my question. Do you deny that he was registered there?

A. By hearsay, he was not registered at the time that I was there. That's hearsay. The owner said he wasn't, anyway." Objection overruled; motion to strike denied.

The jury returned a verdict of guilty of murder in the first degree with recommendation that the punishment be life imprisonment. Defendant appealed.

*Attorney General Morgan and Assistant Attorney General Millard R. Rich, Jr., for the State.*

*Bruce A. Elmore and Richard B. Ford for defendant.*

BRANCH, Justice.

[1] Defendant contends that he has been placed in double jeopardy by being twice tried for the same capital offense of murder. In this connection he contends that Judge McLean erred in entering an order declaring a mistrial without defendant's consent at the 25 May 1970 Session of Madison Superior Court, and that he erred in altering the order of mistrial of 1 June 1970 and in signing the same on 28 January 1971.

[2] The burden is upon defendant to sustain his plea of double jeopardy. He failed to plead double jeopardy and to offer supporting evidence thereon, and he is therefore deemed to have abandoned the plea of double jeopardy and to have relied solely on his plea of not guilty. *State v. Baldwin,* 226 N.C. 295, 37 S.E. 2d 898; *State v. Davis,* 223 N.C. 54, 25 S.E. 2d 164; *State v. King,* 195 N.C. 621, 143 S.E. 140; *State v. Smith,* 170 N.C. 742, 87 S.E. 98; *State v. Ellsworth,* 131 N.C. 773, 42 S.E. 699.

On 25 February 1971, three months after expiration of the time allowed by the trial judge for submitting the case on appeal and 28 days after Judge Thornburg settled the case on appeal, counsel for defendant filed a motion in which it was stated that counsel was employed only two days before the second trial commenced and therefore was not prepared to enter the plea of double jeopardy. By his motion defendant contends that Judge McLean was in error in declaring a mistrial because there was not sufficient evidence presented to the court upon which the court could base a determination that the ends of justice could not be carried out because the jury had been tampered with, and because the court failed to examine the juror involved. Defendant prayed that Judge McLean's order of 1 June 1970 be declared

in error and that the verdict and judgment of the court at the 28 September 1970 session of Madison be declared null and void as in derogation of defendant's constitutional rights not to be tried twice for the same offense.

Although defendant appears to have abandoned the plea of double jeopardy, we choose to consider the merits of this constitutional question because of the seriousness of the crime here involved.

[3] It is a fundamental principle of the common law, now guaranteed by our federal and state constitutions, that no person can be twice put in jeopardy of life or limb for the same offense. *State v. Hicks,* 233 N.C. 511, 64 S.E. 2d 871; *State v. Crocker,* 239 N.C. 446, 80 S.E. 2d 243; *State v. Prince,* 63 N.C. 529; N.C. Const. Art. I, § 17; U. S. Const. Amend. V.

[4] Jeopardy attaches when a defendant in a criminal prosecution is placed on trial: (1) on a valid indictment or information, (2) before a court of competent jurisdiction, (3) after arraignment, (4) after plea, and (5) when a competent jury has been empaneled and sworn. *State v. Birckhead,* 256 N.C. 494, 124 S.E. 2d 838.

[5] In an instant case it is clear that the elements of jeopardy are present. Even where, as here, all the elements of jeopardy appear, a plea of former jeopardy will not prevail where the order of mistrial was properly entered for "physical necessity or for necessity of doing justice." We therefore must consider whether Judge McLean, without defendant's consent, lawfully ordered a mistrial and discharged the jury before verdict.

In *State v. Tyson,* 138 N.C. 627, 50 S.E. 456, it is stated:

"It is well settled, and admits of no controversy, that in all cases, capital included, the court may discharge a jury and order a mistrial when it is necessary to attain the ends of justice. It is a matter resting in the sound discretion of the trial judge, but in capital cases he is required to find the facts fully and place them upon record so that upon a plea of former jeopardy, as in this case, the action of the court may be reviewed."

Accord: *State v. Ellis,* 200 N.C. 77, 156 S.E. 157; *State v. Beal,* 199 N.C. 278, 154 S.E. 604; *State v. Cain,* 175 N.C. 825, 95 S.E.

930; *State v. Upton,* 170 N.C. 769, 87 S.E. 328; *State v. Wiseman,* 68 N.C. 203.

In the case of *State v. Crocker, supra,* Bobbitt, J. (now C. J.) stated:

> "The two kinds of necessity, *i.e.,* 'physical necessity' and the 'necessity of doing justice' were so classified by Boyden, J., in *S. v. Wiseman,* 68 N.C. 203. As to 'physical necessity,' he said: 'One class may not improperly be termed physical and absolute; as where a juror by a sudden attack of illness is wholly disqualified from proceeding with the trial; or where the prisoner becomes insane during the trial, or where a female defendant is taken in labor during the trial.' As to 'necessity of doing justice,' he said that this arises from the duty of the court to 'guard the administration of justice from fraudulent practices; as in the case of tampering with the jury, or keeping back the witnesses on the part of the prosecution.'

> "It will be observed that 'the necessity of doing justice' is not an expression connoting a vague generality but one that relates to a limited subject, namely, the occurrence of some incident of a nature that would render impossible a fair and impartial trial under the law. In *S. v. Wiseman, supra,* the basis for mistrial was 'tampering with the jury.' In *S. v. Bell,* 81 N.C. 591, and in *S. v. Washington,* 89 N.C. 535, 45 Am. Rep. 700, a juror had fraudulently procured himself to be put on the jury for the purpose of acquiting the defendant in a trial for murder. In *S. v. Cain,* 175 N.C. 825, 95 S.E. 930, a juror had given a false answer to the solicitor bearing upon his fitness and qualifications to serve as a juror. . . . "

[6] Judge McLean's findings of fact are to the effect that one Andrew Jack Thomas, during a weekend recess of the trial, in his truck carried Charles Wayne Goforth, a member of the jury trying defendant, to within 100 yards of defendant's trailer home, and at that time juror Goforth instructed Thomas to go to defendant's trailer and tell defendant that juror Goforth wanted to see him on a nearby wooded logging road. Juror Goforth then proceeded down the path into the woods. Thomas delivered the message and returned to his parked truck, and he shortly thereafter saw a black automobile proceed down the

same trail taken by juror Goforth. Defendant is the owner of a black Oldsmobile automobile.

We conclude that these findings of the court, without considering the findings as to the incident in Henderson Cafe, are sufficient to support Judge McLean's conclusion that juror Goforth had "been tampered with and would be unable to render a fair and impartial verdict."

[7] Defendant, however, further argues that the evidence presented to the court was not sufficient to support the court's findings of fact. There is no evidence on this question in the record. Admittedly this Court would have been more enlightened had the record contained the testimony of the witnesses heard by the trial judge on the question of mistrial; however, it is well recognized that a silent record supports the presumption that the proceedings in the court below were regular and free from error. *State v. Mullis,* 233 N.C. 542, 64 S.E. 2d 656. Further, it was the duty of the defendant to see that the record was properly made up and transmitted, and when the matter complained of does not appear of record, defendant has failed to show prejudicial error. *State v. Childs,* 269 N.C. 307, 152 S.E. 2d 453; *State v. Ellis, supra.*

[8, 9] Neither do we find it prejudicial error that the order declaring a mistrial was not signed in term time. The stated purpose of a written order finding facts when a mistrial is ordered in a capital case is to furnish a basis for appellate review. *State v. Tyson, supra.* In instant case the order finding facts and ordering a mistrial was signed long before defendant had raised the issue of double jeopardy, and the order was in the record in ample time for defendant to prepare his case on appeal. The additions found in the signed order merely gave a meaning to the sentence which had evidently been clouded by an inadvertent omission. It is therefore manifest that no prejudicial error resulted from the addition to the order or because the order was signed after adjournment of the 25 May 1970 session.

[10] We find no merit in defendant's further argument that Judge McLean erred in not examining the witness Goforth before he ordered a mistrial. In many instances a trial judge is warranted in examining jurors to see if some untoward incident has so affected them that they cannot render a fair and impartial

State v. Cutshall

verdict. In this case such an examination of the juror whose misdeeds allegedly created the necessity for a mistrial would be a patently vain exercise.

[1] Judge McLean's findings show such absolute necessity for the entry of an order of mistrial that, in law, there was no trial of defendant at the 25 May 1970 session. We therefore hold that defendant was not put in double jeopardy by virtue of the proceedings held at the 25 May 1970 session of Madison Superior Court.

[11] Defendant next contends that two photographs of Reeves' body were erroneously admitted into evidence because they were inflammatory and were introduced without reason since defendant had admitted the cause of Reeves' death.

Properly authenticated photographs of the body of a homicide victim may be introduced into evidence under instructions limiting their use to the purpose of illustrating the witness' testimony. Photographs are usually competent to be used by a witness to explain or illustrate anything that it is competent for him to describe in words. The fact that the photograph may be gory, grewsome, revolting or horrible, does not prevent its use by a witness to illustrate his testimony. *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241; *State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10; *State v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824.

Defendant's admission as to the cause of death did not preclude the State from introducing the photographs of Reeves' body. The admission that Reeves' death was caused by a gunshot wound did not relieve the State of the burden of proving its entire case beyond a reasonable doubt as long as defendant stood on his plea of not guilty. It was an essential part of the State's theory that the victim was shot by someone on decedent's right. The photographs in question were properly used to illustrate testimony of Drs. Duck and Lacey that the fatal bullet had, in fact, entered deceased's right side and exited on his left. The State could, therefore, select the method of proving its case subject to the enforcement of the rules of evidence and fair play by the trial judge. *State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755; *Rivers v. United States,* 270 F. 2d 435, *cert. den.* 362 U.S. 920, 4 L. Ed. 2d 740, 80 S.Ct. 674; *People v. Dunn,* 29 Cal. 2d 654, 177 P. 2d 553; *Commonwealth v. Novak,* 395 Pa. 199, 150 A. 2d 102; *State v. Leland,* 190 Ore. 598, 227 P. 2d 785.

We are aware of the holdings in the cases of *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328, and *State v. Foust,* 258 N.C. 453, 128 S.E. 2d 889. Both of these cases turn on the introduction of an excessive number of photographs having no probative value. Here, the trial judge allowed only two properly authenticated photographs to be introduced under instructions to the jury that they were admitted for the sole purpose of illustrating the witnesses' testimony. There was no error in the admission of the two photographs.

[12] Neither do we find prejudicial error in the admission into evidence of the bloodstained skirt worn by the witness Blanche Cutshall on the night of the homicide.

Mrs. Cutshall, in part, testified: "He shot in—shot into the car there . . . Jack fell over on my legs. . . . With reference to the marks or spots on the bottom portion of this skirt, his head would have been right on my legs where this—this is—where the blood is, because he fell over on me there."

It is not error to permit clothing of a victim or other articles to be introduced into evidence which bear stains or appear corroborative of the theory of the State's case, or which "enable the jury to realize more completely the cogency and force of the testimony of the witness." *State v. Atkinson, supra; State v. Speller,* 230 N.C. 345, 53 S.E. 2d 294; *State v. Vann,* 162 N.C. 534, 77 S.E. 295; *State v. Wall,* 205 N.C. 659, 172 S.E. 216. The cases above cited relate to introduction of the bloodstained and torn clothing of deceased victims of the crime. Certainly the bloodstained skirt of a living witness would not create such prejudice as would the torn or bloodstained clothing of a deceased victim.

[13] Defendant next contends that the trial court erred in permitting Sheriff Roy Roberts and Blanche Cutshall to testify that they heard Dewayne Cutshall make a statement to the effect that defendant was at Riverside establishing his alibi, after Dewayne Cutshall had denied making such statement under cross-examination.

The State recalled Sheriff Roberts, who testified over objection: "We was talking about where he possibly could be. Dewayne says, I know where he is. He's down at Riverside making up alibis." The State also recalled Blanche Cutshall, who testified over objection that she heard her son Dewayne

state in Sheriff Roberts' presence that his daddy was *"probably at Newport establishing an alibi . . . . "* (Emphasis ours.)

When a cross-examiner seeks to discredit a witness by showing prior inconsistent statements or other conduct, the answers of the witness to questions concerning collateral matter are generally conclusive and may not be contradicted by extrinsic testimony. *State v. Poolos,* 241 N.C. 382, 85 S.E. 2d 342; *State v. Broom,* 222 N.C. 324, 22 S.E. 2d 926; *State v. Gardner,* 226 N.C. 310, 37 S.E. 2d 913; *State v. Jordan,* 207 N.C. 460, 177 S.E. 333; Stansbury, North Carolina Evidence § 48. This rule is subject to the following exception: Where a party cross-examines an adverse witness as to collateral matters which tend to show the partiality or bias of the witness toward the cross-examiner's adversary, or which shows the witness' hostility toward the cross-examiner's cause, the cross-examiner is not bound by the witness' answer denying partiality or hostility. The cross-examiner, after putting the witness on notice, is at liberty to contradict the witness by extrinsic evidence. *State v. Hart,* 239 N.C. 709, 80 S.E. 2d 901; *State v. Roberson,* 215 N.C. 784, 3 S.E. 2d 277; *State v. Spaulding,* 216 N.C. 538, 5 S.E. 2d 715; *State v. Rowell,* 244 N.C. 280, 93 S.E. 2d 201; *State v. Patterson,* 24 N.C. 346; 58 Am. Jur., Witnesses, § 715.

In the case of *State v. Taylor,* 250 N.C. 363, 108 S.E. 2d 629, the Court considered the proper test for determining whether contradictory testimony relates to a material or collateral matter, and stated:

" . . . [D]efendant quotes Stansbury, North Carolina, Evidence, § 48(3): 'The proper test would seem to be whether the evidence offered in contradiction would be admissible if tendered for some purpose other than mere contradiction; or, in case of prior inconsistent statements, whether evidence of the facts stated would be so admissible.' The 'proper test,' as so defined, is amply supported by cases cited by Professor Stansbury and by defendant."

Assuming, *arguendo,* that Dewayne made the statement attributed to him under the circumstances related, it is obvious that such statement would be, at most, a speculative, conjectural expression of opinion completely lacking in probative value towards establishing a material fact in the case. The statement would not be admissible for any purpose other than contradic-

State v. Cutshall

tion, and is therefore collateral. Thus, when Dewayne Cutshall denied making the collateral statement, the State was bound by his answer and could not offer extrinsic evidence for the purpose of impeaching the witness as to his prior inconsistent statements. Yet, the admission of the incompetent testimony of Blanche Cutshall and Sheriff Roy Roberts contradicting Dewayne's denial gave the State the benefit of evidence which tended to weaken and undermine defendant's sole defense of alibi. The admission of the evidence is rendered highly prejudicial for the reason that its weight would be greatly magnified in the eyes of the jury because the damaging statements allegedly came from defendant's own child who was a witness for the defense.

The State did not contend—and we think properly so— that the contradictory evidence was admissible to show bias, temper or disposition of the witness. Assuming that the statement was made and that its content was such as to show bias or partiality, it could only be interpreted to show bias or partiality in favor of the State and against defendant.

Defendant did not request, nor did the judge on his own motion give, instructions restricting the evidence to impeachment. Had the instructions been given, the incompetent evidence would not have been rendered competent; nor is it probable that its highly prejudicial effect would have been diluted in the eyes of the jury by such instructions.

Error in the admission of this evidence requires a new trial.

Since there must be a new trial, we do not deem it necessary to discuss defendant's assignment of error concerning hearsay testimony of Bobby Stinson. The answer complained of was clearly hearsay, but was "invited" by defendant's counsel. In all probability this occurrence will be avoided at the new trial. *State v. Burton*, 256 N.C. 464, 124 S.E. 2d 108; *State v. Williams*, 255 N.C. 82, 120 S.E. 2d 442; *State v. Sutton*, 225 N.C. 332, 34 S.E. 2d 195.

New trial.