STATE OF NORTH CAROLINA v. MICHAEL EDWARD MADDEN AND CHARLES BRUCE KEETEN

No. 27

(Filed 7 March 1977)

1. **Criminal Law § 92— defendants charged with same crime — motion for separate trials — denial proper**

   The trial court did not err in denying the motion of one of the defendants for a separate trial, since the two defendants were duly charged in separate indictments with the same crime, their defenses

State v. Madden

were not antagonistic, and neither attempted to incriminate the other defendant.

2. **Jury § 7; Constitutional Law § 36— jurors' death penalty views — death penalty invalidated during trial — no new trial**

In a first degree murder prosecution where the State successfully challenged jurors who were unalterably opposed to the death penalty, the decision of the U. S. Supreme Court rendered during the course of the trial that imposition of the death penalty under the laws of N. C., then in effect, would violate the XIV Amendment to the U. S. Constitution did not transform the sustaining of the State's challenges to those prospective jurors into a valid basis for granting defendants a new trial.

3. **Constitutional Law § 36; Homicide § 31— first degree murder — death penalty invalidated during trial — fair trial**

In a first degree murder prosecution defendants' contention that they were denied a fair trial because the U. S. Supreme Court decision declaring the death penalty as applied in N. C. unconstitutional became known after counsel for one defendant had concluded his jury argument but prior to the jury argument by counsel for the other defendant was without merit.

4. **Homicide § 20— photographs of victim — admissibility for illustration**

The trial court in a first degree murder prosecution did not err in permitting the State to introduce in evidence two photographs of the victim's body at the crime scene, since photographs, though gruesome, which fairly portray a scene observed by a witness and which can be used to illustrate his testimony may be admitted in evidence.

5. **Criminal Law § 89— corroborative testimony — admissibility**

The trial court did not err in admitting testimony of a witness concerning statements made by one of the perpetrators of the crime to her on the morning after the crime with reference to the details thereof and the participation of the two defendants therein, since the evidence was admitted for the purpose of corroborating the perpetrator who had previously testified, and the court sustained objections to those parts of the witness's testimony which added details not contained in the previous testimony of the perpetrator.

6. **Criminal Law §§ 35, 73— crime committed by another — hearsay testimony**

In a first degree murder prosecution statements by third persons to an investigating officer concerning their involvement in the crime under investigation or the involvement of persons other than defendants constituted hearsay, and such statements were not admissible as declarations against interest.

7. **Criminal Law § 89— corroborative testimony — admissibility**

Evidence showing that defendant, on the day after the alleged robbery and murder, purchased and paid for an automobile with coins

and bills, such as would be likely to have been in the cash register of the robbed store, he having admitted that he was unemployed and had no funds as recently as a week before and had received in the meantime less than $100, was corroborative of a witness's earlier testimony and was competent to show circumstances indicating defendant's guilt of the crime with which he was charged.

8. **Criminal Law § 106— accomplice testimony — sufficiency to establish guilt**

   While the testimony of an accomplice is to be considered with great care by the jury, its credibility is for the jury and, if it is believed by them and found by them sufficient to establish the guilt of the accused beyond a reasonable doubt, it will support a conviction.

APPEAL by defendants from *Thornburg, J.*, at the 2 July 1976 Schedule "A" Criminal Session of MECKLENBURG.

Upon an indictment, proper in form, each defendant was found guilty of murder in the first degree and sentenced to imprisonment for life.

At approximately 11:30 p.m. on 30 December 1974, Lawrence Edward McGinnis, Jr., was found lying face down on the floor of the storage room of the Kwik-Pik store on Idlewild Road in Mecklenburg County, of which store he was the manager. His hands were tied behind his back and he was dead, the cause of death being two gunshot wounds in the back of his head. There was a third gunshot wound on his shoulder. No one else was in the store.

At approximately 10:53 p.m., Sylvia Russell had arrived at the store and attempted to enter it to make a purchase. She observed a pale blue or green van in the store parking lot and a "huddle" of men inside the store, part of the lights of which had been turned off. As she parked her car beside the van, the men inside the store "scattered out" and one of them picked up a mop and started mopping the floor. Another, a blond man, met her at the door and, as she was attempting to enter the store, locked it and refused to let her enter. She asked two or three times for permission to come in and purchase cigarettes but he shook his head "with a mean look" and she left. On 31 January 1975, a police officer requested her to ride around with him to see if she would recognize anyone. They rode through a number of service stations in the course of about an hour and a half. At one of these she recognized Jack Payne as the man whom she had faced through the glass door of the Kwik-Pik

store and so identified him to the officer. She also identified him in court and identified a photograph of a pale blue or green van owned by Payne and Keeten as similar to the one she had observed in the parking lot of the store.

No wallet was found on the body of McGinnis. On 5 January 1975, his wallet was found in a ditch, not far from the Kwik-Pik store.

Payne was arrested after he was so identified by Mrs. Russell. He is a first cousin to the two defendants, who are half brothers. On 30 December 1974, he lived with the defendant Keeten, a woman named Kathy Woods and her two infant daughters. He and the two defendants were then unemployed. Payne made a detailed statement to the investigating police officers and an agreement was reached whereby he would be permitted to plead guilty to second degree murder in exchange of his testimony against the present defendants. Substantially in accordance with his statement given to the investigating officers, he testified to the following effect:

Keeten told Payne of plans which Keeten and Madden had for robbing the Kwik-Pik store and invited Payne to participate in the robbery, which Payne agreed to do. On the night of 30 December 1974, Keeten and Payne drove over to Madden's house in the van. Madden joined them and they went to a lounge for something to drink. There, they planned the robbery, including the tying up of whoever was working in the store. Keeten said they might have to kill somebody.

They then went to the store, entered it and told the clerk (McGinnis), "This is a holdup." Keeten and Payne took McGinnis to the back room and Madden started going through the cash register. They ordered McGinnis to lie down on his stomach, which he did, and Payne took the keys and went to lock the front door of the store. As he was doing so, he observed a car pulling up and told Madden someone was coming. Madden got a mop and pretended to be mopping the floor. A lady came to the door of the store and wanted cigarettes but Payne told her the store was closed and she left. Payne then tied the hands of McGinnis with a drawstring from Payne's army field coat. Keeten and Madden each had a pistol, Keeten's being a .22 caliber and Madden's a .38. (In the opinion of the medical examiner who conducted an autopsy upon the body of McGinnis, the wounds in the head were caused by small caliber

State v. Madden

bullets, probably a .22.) Keeten took McGinnis' wallet. Keeten then gave Payne the keys to the van and told him to get it ready to leave. Payne then went to the van and started it. While Payne was so seated in the van, he observed Keeten and Madden going into the back room of the store but heard no shots. The motor of the van was very noisy.

As they drove home Payne expressed the hope that the lady who had come to the door of the store did not recognize them and Keeten said had he known of the lady's presence at the door he would not have shot McGinnis. At Madden's home they divided the money, Payne giving $100.00 of his share to Keeten to help pay for a car they were going to buy. The next morning Payne read in the newspaper about the robbery and murder and told Kathy Woods what had happened the previous night.

Following his arrest, Payne was taken to the police station and informed of his rights. In his statement, made thereafter to the investigating officers, he said that, in the presence of Payne and Madden's wife, Keeten had made the statement that when he fired his pistol he "aimed low." In testifying on cross-examination, Payne said he recalled Keeten's statement as being that he had "aimed high" when he fired the gun.

David Scott Payne, brother of Jack Payne, testified that Jack Payne, prior to his arrest, told him about the robbery and had said that they went in to rob the place, put the store employee in the back room and Mike (Madden) started mopping the floor when a lady came to the door and saw them.

Kathy Woods testified that she lived with Payne and Keeten and, on the evening of 30 December 1974, the two men left in the van, returning after midnight. They came into the house together, Payne pulled money from his pocket and laid it on the table and "they said that they had robbed the Kwik-Pik." They then proceeded to count the money out and put it in piles and Payne gave Keeten some money "to go toward the car." The following morning Payne and Kathy Woods read about the robbery in the newspaper and Payne told her it was correct that "the boy had been shot." He also told her that he, Madden and Keeten went into the store, pretended to be customers, held up the clerk and took him back into the storage room. He further told her that as he went to lock the door a woman came to the door and asked for a pack of cigarettes

but he told her the store was closed and locked the door, where-upon she returned to her car and left. He told her that he "tied the boy's hands behind his back, and he was laying on the floor." Payne further told her that Keeten took a wallet from Mc-Ginnis.

Each defendant testified in his own behalf and denied that either he or the other defendant had any participation in the robbery and murder, each testifying that he and the other de-fendant spent the evening together at Madden's house and at a poolroom. Each testified that Payne and Keeten arrived at Madden's home in the van at approximately 8:30 p.m. on 30 December 1974, that shortly thereafter Payne left alone in the van and returned therein to Madden's home at approximately 11:30 p.m., after which Payne and Keeten returned to their home and there (according to Keeten), Payne gave Keeten some money, neither defendant having been with Payne at any time between Payne's departure from Madden's home and his return thereto. Each denied any knowledge of the robbery-murder, other than what he had read about it and what had been told to him. Keeten denied making any statement to anyone that he fired a gun or aimed either high or low at McGinnis.

The defendants introduced other evidence designed to show their own good characters and to discredit Payne's and to con-tradict his statements concerning the division of money on the evening of 30 December 1974 and the alleged comment by Keeten that he had "aimed high" or "aimed low" at McGinnis. Keeten testified that he bought and paid cash for a car some time prior to 30 December 1974.

In rebuttal, the State offered the testimony of Ronald Bailey, who testified that, on 1 January 1975, he sold an auto-mobile to Keeten for $250.00 and received in payment cash in the form of coins and bills of varying denominations.

When the trial of the defendants began, the law of North Carolina provided that the punishment for murder in the first degree was death by asphyxiation. Prospective jurors were ex-amined on voir dire concerning their views on capital punish-ment and were told that if the jury returned a verdict of guilty of murder in the first degree against either or both defendants, the defendant so convicted would be sentenced to death.

After the completion of the argument to the jury by coun-sel for Keeten, the court took the customary noon recess. Dur-

ing that recess, the decision of the Supreme Court of the United States in *Woodson v. North Carolina,* ____ U.S. ____ , 96 S.Ct. 2978, 49 L.Ed. 2d 944, was announced. The court stated to counsel, out of the presence of the jury, that, by virtue of this decision, the death penalty could not be imposed upon these defendants and stated that he would instruct the jury that, in event of a verdict of guilty (the alternatives submitted to the jury being, "guilty of murder in the first degree" and "not guilty"), the maximum punishment would be life imprisonment and stated that he would permit the attorneys so to argue.

Keeten's attorney requested a further instruction that this development "does not change the measure of proof or quantum of proof necessary" and that the jury be instructed "that if they could not have found them guilty beyond a reasonable doubt and sentenced them to the death penalty, that they could not find them guilty by the same measure of proof to be sentenced to life imprisonment." Thereupon, the jury returned and counsel for Madden made his argument. The record does not indicate that counsel for Keeten requested permission to address the jury further in behalf of his client.

Concerning this development, the court instructed the jury:

"Also, Members of the Jury, during the course of this trial the Supreme Court of the United States has rendered a decision which holds that the death penalty as applied in North Carolina is unconstitutional. Therefore, if these defendants, or either of them, are convicted of murder in the first degree, then the punishment will be life imprisonment. I instruct you, however, that the measure of proof has not changed. That is to say that if you could not convict the defendants on the evidence presented in this trial, if the penalty had been death, then you could not convict the defendants because of the fact that the penalty has changed during the course of this trial."

The defendants' Assignment of Error No. 3 is:

"The prejudice and harm caused the defendants by selecting the jury and trying the case on one theory of law and having the law changed at the conclusion of the trial."

Upon appeal, counsel for Keeten did not file a separate brief but adopted that filed by counsel for Madden and confined his oral argument to the contention that, as a result of

the above mentioned decision of the United States Supreme Court, the case was converted from a capital to a non-capital case after he had completed his argument to the jury.

*Rufus L. Edmisten, Attorney General, by Thomas B. Wood, Assistant Attorney General, for the State.*

*Nelson M. Casstevens, Jr., for defendant Madden.*

*Arthur Goodman, Jr., for defendant Keeten.*

LAKE, Justice.

[1]   There was no error in the denial of the motion of Madden for a separate trial. The two defendants were duly charged in separate indictments with the same crime. The State proceeded upon the theory that the murder, with which they were charged, was committed in the course of a robbery committed by them jointly. Their defenses were not antagonistic. On the contrary, each testified in support of their joint alibi. Neither, in his testimony or other evidence, attempted to incriminate the other defendant. This assignment of error is overruled. G.S. 15A-926; *State v. King,* 287 N.C. 645, 215 S.E. 2d 540 (1975) ; *State v. Overman,* 269 N.C. 453, 466, 153 S.E. 2d 44 (1967) ; *State v. White,* 256 N.C. 244, 123 S.E. 2d 483 (1962) ; *State v. Bryant,* 250 N.C. 113, 108 S.E. 2d 128 (1959) ; *State v. Combs,* 200 N.C. 671, 158 S.E. 252 (1931).

[2]   The defendants are not entitled to a new trial by reason of the sustaining of the State's challenges to jurors who, on voir dire, stated that they were opposed to the death penalty and under no circumstances, regardless of the evidence introduced by the State, would they vote to convict if such conviction would result in the imposition of the death penalty. At the time the jury was being selected, the State was seeking the death penalty pursuant to the then established law of North Carolina. It is conceded by the defendants that the sustaining of the challenges to these jurors met the test established in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1968), and in numerous decisions of this Court. *State v. Bock,* 288 N.C. 145, 217 S.E. 2d 513 (1975) ; *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974). The fact that between the empaneling of the jury and the return of the verdict, the Supreme Court of the United States in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976), determined that

the imposition of the death penalty under the laws of North Carolina, then in effect, would violate the Fourteenth Amendment to the Constitution of the United States did not transform the sustaining of these challenges to prospective jurors into a valid basis for granting these defendants a new trial.

Prior to the inception of this case, decisions of this Court established the right of counsel for the State and counsel for the defendant charged with a capital crime to examine any prospective juror, tendered to him for voir dire, concerning the attitude of such juror toward capital punishment. *State v. Bock, supra; State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974). The then unsuspected error of counsel, in so advising prospective jurors as to the punishment which would be imposed upon these defendants in event of their conviction of first degree murder, was corrected by the charge of the court, upon the court's learning of the decision of the Supreme Court of the United States in *North Carolina v. Woodson, supra.*

The defendants do not contend that the jurors voted to convict under the impression that the defendants would be sentenced to death. Their contention is quite to the contrary; namely, that the jurors were improperly excused because they were unwilling to have any part in the infliction of the death penalty and would not return a verdict of guilty which would have resulted therein. Thus, they contend that the exclusion of these prospective jurors, plus the subsequent instruction that the death penalty would not be inflicted, resulted in a trial jury unlawfully predisposed to convict the defendants of a crime for which the punishment was not death, but life imprisonment.

This contention of the defendants is wholly speculative and without merit. In the first place, it is speculative as to whether any of the eight jurors, excused because of their opposition to the death penalty, would have survived other challenges by either the State or one of the defendants. Secondly, nothing in the record, or in common experience of which we may take judicial notice, indicates that any prospective juror, so excused, had any scruple against convicting a defendant upon the charge of first degree murder, when the evidence satisfied such juror of his guilt thereof beyond a reasonable doubt, had such prospective juror been told, as the trial jury in this case was told, that the penalty to be imposed upon such conviction would be imprisonment for life. We are aware of no plausible

basis for the assertion that a juror, who has no conscientious objection to the imposition of the death penalty for the offense of murder committed in the perpetration of a robbery, would be more easily convinced of guilt beyond a reasonable doubt than would a juror having conscientious objection to the death penalty but no objection to a sentence to life imprisonment for such offense. This contention was met and rejected by the Supreme Court of the United States in *Witherspoon v. Illinois, supra*. It was also rejected by this Court in *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481 (1969). See also: *Bumper v. North Carolina,* 391 U.S. 543, 545, 88 S.Ct. 1788, 20 L.Ed. 2d 797 (1968) ; *People v. Rhinehard,* 107 Cal. Rptr. 34, 507 P. 2d 642 (1973) ; *Commonwealth v. McAlister,* 365 Mass. 454, 313 N.E. 2d 113 (1974) ; *Commonwealth v. Martin,* 348 A. 2d 391 (Pa. 1975).

The defendants do not suggest that any member of the trial jury was not competent to serve. The defendants closely examined each of these jurors and expressed satisfaction with him or her, after first challenging successfully numerous other prospective jurors. The record does not indicate that either defendant exhausted the peremptory challenges allowed him by the law of this State. See: *State v. Perry,* 277 N.C. 174, 176 S.E. 2d 729 (1970) ; *State v. Bock, supra.*

As this Court, speaking through Justice Higgins, said in *State v. Peele,* 274 N.C. 106, 113, 161 S.E. 2d 568 (1968), cert. den., 393 U.S. 1042:

"Each party to a trial is entitled to a fair and unbiased jury. Each may challenge for cause a juror who is prejudiced against him. A party's right is not to select a juror prejudiced in his favor, but to reject one prejudiced against him."

As the defendants concede in their briefs, this Court has, both before and after the decision of the Supreme Court of the United States in *North Carolina v. Woodson, supra,* rejected the contention that a trial jury, selected as was the one that convicted these defendants, is improperly constituted, so as to entitle the defendant, convicted and sentenced to imprisonment, to a new trial. *State v. Montgomery,* 291 N.C. 235, 229 S.E. 2d 904 (1976) ; *State v. Davis,* 290 N.C. 511, 227 S.E. 2d 97 (1976) ; *State v. Swift,* 290 N.C. 383, 226 S.E. 2d 652 (1976) ; *State v. Covington,* 290 N.C. 313, 226 S.E. 2d 629 (1976) ; *State*

*v. Phifer,* 290 N.C. 203, 225 S.E. 2d 786 (1976). This assignment of error is overruled.

[3]   The defendants next contend that they were denied a fair trial because the decision of the Supreme Court of the United States in *North Carolina v. Woodson, supra,* became known after counsel for Keeten had concluded his argument to the jury and prior to the argument to the jury by counsel for Madden. Nothing in the record, brief or oral argument by counsel for Keeten suggests that he requested permission of the trial court to resume his argument to the jury after it became known that the death penalty would not be imposed in event of a verdict of guilty of murder in the first degree. The record shows that, in the absence of the jury, when the trial court determined, on the basis of information received through the news media, that the death penalty could not be constitutionally imposed in this case, he informed counsel that he would instruct the jury that, in event of a verdict of guilty, the maximum punishment would be life imprisonment and that he would permit the attorneys so to argue. Counsel for Keeten thereupon requested only an instruction that "this does not change the measure of proof or quantum of proof necessary," and "that the jury be specifically instructed that if they could not have found them guilty beyond a resonable doubt and sentenced them to the death penalty, that they could not find them guilty by the same measure of proof to be sentenced to life imprisonment." This instruction, in a more grammatical form, was given. Counsel for Madden, interposing no objection to the proposed (and given) instructions concerning the punishment to be inflicted in event the jury returned a verdict of guilty of murder in the first degree, then proceeded with his argument to the jury.

This precise contention was rejected by the Court of Appeals of Washington in *State v. Trevino,* 10 Wash. App. 89, 516 P. 2d 779 (1973), following the decision of the Supreme Court of the United States in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346 (1972).

The decision of the Supreme Court of the United States with reference to the constitutionality of the death penalty did not alter the charge against the defendants. They remained on trial on the charge of murder perpetrated in the commission of a robbery, which is first degree murder under the law of this State. The jury was specifically instructed as to each defendant

that it must return a verdict of not guilty unless the State had convinced it beyond a reasonable doubt that such defendant had committed each element of the offense charged. We reject as utterly without foundation the defendants' implied contention that, upon learning that the death penalty could not be imposed, the jury relaxed and voted to convict without considering the evidence with the care it would otherwise have given it. We must presume that the jury, mindful of its own oath and responsibility, understood, accepted and applied the court's proper instruction with reference to the State's burden of proof and the meaning of "reasonable doubt." *State v. Ray,* 212 N.C. 725, 194 S.E. 482 (1937). This assignment of error is overruled.

[4]     There is no merit in the contention of the defendants that the court committed error in permitting the State to introduce in evidence two photographs of the body of McGinnis, as it lay on the floor of the storage room. We have said many times that photographs, though gruesome, which fairly portray a scene observed by a witness and which can be used to illustrate his testimony may be admitted in evidence. *State v. Chance,* 279 N.C. 643, 185 S.E. 2d 227 (1971); *State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971); *State v. Cutshall,* 278 N.C. 334, 180 S.E. 2d 745 (1971); *State v. Moore,* 276 N.C. 142, 171 S.E. 2d 453 (1970); *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969); *State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10 (1967). The use of two photographs, though similar, for this purpose is not excessive. *State v. Cutshall, supra.* This assignment of error is overruled.

[5]     We find no error in the rulings of the trial court concerning the admission of testimony of Kathy Woods concerning the statements by Payne to her the morning after the alleged robbery and murder with reference to the details thereof and the participation of the two defendants therein, this evidence being admitted for the purpose of corroborating Payne who had previously testified.

When Kathy Woods first began to testify as to what Payne told her, counsel for Keeten objected "to this whole line." This general objection was properly overruled since such testimony as was then in question would have been admissible for corroboration of Payne.

Thereupon, in response to the question, "What did Jack Payne tell you about the events of the 30th of December, 1974,

at the Kwik-Pik on Idlewild Road?" the witness responded that Payne told her that Keetan and Madden "had been watching the Kwik-Pik on Idlewild Road for approximately a week" to learn about the closing procedures at the store. The court, on its own motion, interrupted, sustained the objection and ordered that testimony stricken, telling the jury not to consider it at any point in its deliberations. Thereupon, counsel for both defendants moved for a mistrial, which was denied.

The court then, in the absence of the jury, instructed the witness to confine her testimony in response to the question to "any statement that was made about what occurred at the Kwik-Pik only." She was instructed not to talk about "stake-outs and so forth" and to start "from where they pulled up to the Kwik-Pik." The jury was then returned to the courtroom and the District Attorney repeated the question. Objection by counsel for each defendant was overruled. The jury was instructed, "This evidence is offered and admitted for the sole purpose of corroborating or strengthening the testimony of the witness, William Jackson Payne, Jr., if you find that it does or tends to do so. It may not be considered by you for any other purpose."

The witness then proceeded to testify as to the statement made to her by Payne the morning after the alleged robbery when she related that Payne had said that Madden, in walking over to the beer case in the store, "was really trying to look in behind the cooler to see if anybody was in the back room." Counsel for each defendant moved to strike that portion of the answer and this motion was allowed. Again, the court instructed the jury not to consider this statement "at any point in their deliberation." Again, motions for mistrial were denied.

The witness then proceeded to testify as to what Payne had told her concerning the details of the robbery. In the course of doing so, she said Payne told her that, as he walked back into the storage room, he heard Keeten ask McGinnis how much money he had in his wallet and McGinnis say in response, "None," following which Keeten bent down to get the wallet and found therein $60.00 and asked McGinnis why McGinnis had lied. The witness then said (still purporting to paraphrase Payne's statement to her), "and he got kinda mad and when the McGinins boy told him—" At that point, counsel for each defendant objected "to that," and the court replied, "Sustained, Members of the Jury."

The defendants then moved to strike the entire testimony of Kathy Woods and renewed their motions for mistrial. These motions were denied and the direct testimony of the witness ended. The attorney for each defendant then cross-examined her, attacking her moral character for the obvious purpose of discrediting her as a witness.

Assuming that the final objection to the testimony of Kathy Woods related, not merely to what she was about to say when interrupted but to her testimony concerning Payne's statement about the taking by Keeten of the wallet and the amount of money found therein, we find no basis for a new trial in any of the rulings of the court concerning the testimony of this witness. In each instance, when the testimony of Kathy Woods added details not contained in the previous testimony of Payne, the trial court sustained the objection. Although in the last instance the court did not specifically instruct the jury not to consider the statement, his ruling, "Sustained, Members of the Jury," could hardly have been misunderstood by the jurors in view of his virtually contemporaneous express instructions that prior statements by Kathy Woods were not to be considered by them in their deliberations.

As stated by Justice Sharp, now Chief Justice, in *State v. Brooks,* 260 N.C. 186, 132 S.E. 2d 354 (1963):

> "If a prior statement of a witness, offered in corroboration of his testimony at the trial, contains additional evidence going beyond his testimony, the State is not entitled to introduce this 'new' evidence under a claim of corroboration * * * However, if the previous statements offered in corroboration are generally consistent with the witness' testimony, slight variations between them will not render the statements inadmissible. Such variations affect only the credibility of the evidence which is always for the jury."

The case of *State v. Warren,* 289 N.C. 551, 223 S.E. 2d 317 (1976), relied upon by the defendants, is distinguishable. There, the supposedly corroborating testimony went beyond the previous testimony of the witness to be corroborated and was admitted in evidence, there having been no objection or motion to strike. Here, on the contrary, the alleged "new" evidence was not admitted. For the same reason, *State v. Fowler,* 270 N.C. 468, 155 S.E. 2d 83 (1967), is also distinguishable

from the present case. Furthermore, in the Fowler case, the objectionable testimony was not simply new, but actually contradicted the testimony it was offered to corroborate.

Furthermore, the testimony of Payne did show that prior to his joining the two defendants in the robbery, the two defendants had formulated plans for the robbery and told him of them. Payne's testimony further disclosed that Keeten took a wallet from McGinnis, the wallet being subsequently found in a ditch not far from the Kwik-Pik store. Payne testified that Keeten asked McGinnis if he had any money and McGinnis replied that he did not, but Keeten "took his wallet out."

To be admissible as corroborative evidence, testimony of a prior statement by the witness sought to be corroborated does not have to be precisely identical to such prior testimony of that witness. Slight variations between the testimony of such witness and the prior statement by him offered to corroborate it do not render the latter evidence incompetent. The testimony offered to corroborate is competent if it does so substantially. *State v. Westbrook, supra; State v. Norris,* 264 N.C. 470, 141 S.E. 2d 869 (1965) ; *State v. Brooks, supra; State v. Case,* 253 N.C. 130, 116 S.E. 2d 429 (1960) ; *State v. Walker,* 226 N.C. 458, 38 S.E. 2d 531 (1946). We find no such variance between the testimony of Payne and the testimony of Kathy Woods, admitted into evidence, as would make the latter testimony incompetent. This assignment of error is overruled.

**[6]** Officer C. A. Hearne of the Mecklenburg County Police Department, called as a witness for the defendant Keeten, testified that he investigated the robbery and murder here in question and, in the course of his investigation, interviewed certain Negro suspects named Bobby Lee Wall and Gerald Edward Jones, among others. When asked if they had confessed to this robbery and murder, the court sustained the State's objections. In the trial court the defendant Madden argued:

"Your Honor, I think his answer to the question would be admissible for the purposes of not proving the truth of the matter asserted therein, *and I do not tender it to prove the truth of the matter asserted therein.* I tender it to show that on frequent occasions during the investigation of this crime, that many people, for whatever reason they may have had, have admitted being involved in it or have admitted the murder of Eddie McGinnis, and not to

prove that someone else did it but to prove that there are people who, for whatever reason they may have, would confess to a police officer something that is totally and completely unfounded as far as this officer is concerned." (Emphasis added.)

Officer Hearne was then permitted to state for the record, in the absence of the jury, that he did talk with Gerald Edward Jones at the State Prison in Raleigh, where Jones was, and apparently still is, incarcerated. In that interview Jones gave Officer Hearne a written statement to the effect that he and two companions, Walter Harris and Norman Anthony, held up the Kwik-Pik store on the night in question and, in the course of the holdup, the clerk of the store was shot and was put in the back of the store. A week later Officer Hearne again interviewed Jones in the offices of the State Bureau of Investigation in Raleigh and Jones gave Officer Hearne another written statement on which he said that he, Harris and Anthony, on the night in question, held up another store and then, while riding around looking for a second store to rob, came to the Kwik-Pik store on Idlewild Road and there, soon after entering the store parking lot, saw two other Negro men inside the store, these being identified as Billy Huntley and Otho Lowe, and, while so parked in the parking lot of the store, they observed these men scuffling with the clerk, who "got on the floor" and observed the men pull the clerk to the back of the store, whereupon Jones heard "at least two shots" and saw Lowe run out of the front door "trying to cover up a short shotgun," following which Jones and his companions departed. Clearly, the second statement contradicted the first and was neither a confession by Jones nor a statement against his interest.

Officer Hearne, in the course of his investigation, also obtained from Donald Taylor and Bobby Wall written statements tending to implicate Billy Huntley in the robbery and murder in question. Another officer, also investigating the matter, interviewed Earl Brown and obtained a statement from him implicating Huntley and Lowe in the robbery and murder. These statements were neither confessions nor statements against the interest of the declarant.

None of these men was called as a witness by the defendants or subpoenaed by them and it was not shown that any of them was not available to subpoena.

State v. Madden

Obviously, all such statements made to the witness Hearne by these individuals constituted hearsay. The defendants contend that they are, nevertheless, admissible as declarations against interest. The precise question was passed upon by this Court in State v. English, 201 N.C. 295, 159 S.E. 318 (1931), in which the Court held, "The voluntary confession of a third party, made to officers of the law, that he killed the deceased, detailing the circumstances," was not competent evidence in behalf of the defendant charged with the murder. In that case, this Court reviewed and rejected authorities to the contrary now relied upon by the defendants. Furthermore, a prerequisite to the admission of hearsay on the ground that the statement constitutes a declaration against interest is that "the declarant must be dead or, for some other reason, unavailable as a witness." Stansbury, North Carolina Evidence (Brandis Rev.), § 147. It is not here shown that the maker of any of the statements in question was not available as a witness.

Furthermore, of all the statements in question, only the first one made by Gerald Jones implicated the declarant in the robbery and murder here in question, and it is directly in conflict with his second statement to Officer Hearne. Both statements by Jones are in direct conflict with the testimony of Mrs. Russell, the customer who identified Payne, in court, as the man who blocked her entrance into the store, and with Payne's own testimony that he did so while the holdup was in progress. While this conflict would not, of itself, make the statements by Jones incompetent, it renders it almost inconceivable that the jury would have believed the statement of Jones, even if it had been admitted into evidence. This assignment of error is overruled.

[7] The defendants next contend that it was error to permit the State to introduce the evidence of Ronald Eugene Bailey to rebut the testimony of Keeten. Keeten had testified on cross-examination by the State that, as of 30 December 1974, he had been unemployed for almost 30 days, that in November he had received from Payne $200.00 which was part of the proceeds of another theft by Payne, and with the $200.00 he had paid rent, purchased groceries and "some stuff for Christmas," thus spending all of that money. He further testified that he did not have any of that money after Christmas Day and did not receive any money for Christmas from his mother or anybody else, nor did he receive any money from Jack Payne. Prior to

January 1, he did some odd jobs for which he received less than $100.00. He purchased a 1955 Chevrolet automobile for $200.00, paying for it "with cash money in bills," this being "several days before" the transfer of the title to him on 1 January 1975.

In rebuttal, the State introduced the testimony of Ronald Eugene Bailey, the seller of the car, who testified that he sold it to Keeten for $250.00 and Keeten paid him on 1 January 1975, the payment being made as follows: "Five dollars worth of quarters, approximately between 50 and 75 one dollar bills, a few fives, tens, a couple of twenties, and a fifty."

This was not a contradiction of Keeten upon a collateral matter for the purpose of impeaching his credibility as a witness. It was evidence that corroborated Payne's testimony that Keeten participated in and shared the proceeds of the robbery in question. In *State v. Long,* 280 N.C. 633, 640, 187 S.E. 2d 47 (1972), speaking through Justice Huskins, we said, "The proper test for determining what is material and what is collateral is whether the evidence offered in contradiction would be admissible if tendered for some purpose other than mere contradiction; or in the case of prior inconsistent statements, whether evidence of the facts stated would be so admissible."

Clearly, evidence showing that the defendant, on the day after the alleged robbery and murder, purchased and paid for an automobile with coins and bills, such as would be likely to have been in the cash register of the robbed store, he having admitted that he was unemployed and had no funds as recently as a week before and had received in the meantime less than $100.00, would be competent to show circumstances indicating his guilt of the crime with which he is charged. We find no merit in this assignment of error and it is overruled.

[8] The final assignment of error argued by the defendants in their brief is the denial of their motion to dismiss as of nonsuit. This assignment is clearly without merit and is overruled. While, as the trial court instructed the jury, the testimony of an accomplice is to be considered with great care by the jury, its credibility is for the jury and, if it is believed by them and found by them sufficient to establish the guilt of the accused beyond a reasonable doubt, it will support a conviction. *State v. McNair,* 272 N.C. 130, 157 S.E. 2d 660 (1967). It is also well established that, upon a motion for judgment of nonsuit, the evidence by

the State is to be deemed true and is to be considered in the light most favorable to the State. *State v. McKenna,* 289 N.C. 668, 683, 224 S.E. 2d 537 (1976); *State v. Jenerett,* 281 N.C. 81, 187 S.E. 2d 735 (1972); *State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755 (1971); *State v. Primes,* 275 N.C. 61, 165 S.E. 2d 225 (1969).

The defendants have expressly abandoned in their brief their assignment of error relating to the charge of the court concerning the law as to accomplices. In this they were well advised. We have carefully examined this and other portions of the charge and find no error therein.

No error.