### STATE v. STEPHEN ENGLISH.

(Filed 2 July, 1931.)

**1. Criminal Law G 1—Testimony of confession of third party held inadmissible as hearsay evidence.**

Testimony of a voluntary confession of a third party that he committed the crime is held properly excluded by the trial court in the trial of the defendant for the murder of his wife, it being established by a long line of decisions that such evidence is incompetent as hearsay. The question whether the technical rule is based upon common sense and reason discussed by BROGDEN, J.

**2. Homicide G d—Defendant's infatuation for girl held competent as tending to establish motive for murder of wife.**

Where there is strong evidence that the defendant actually committed the murder of his wife for which he was tried, proof of motive is not necessary to convict, but evidence that he was infatuated with another woman at the time is properly admitted as a circumstance tending to show motive under the facts of this case.

**3. Criminal Law G r—Testimony in this case held competent as tending to impeach witness.**

Where on the trial of a husband for the murder of his wife the wife's father testifies in the husband's behalf, exception to testimony tending to show that the father had attempted to bribe another to implicate others will not be sustained.

CRIMINAL ACTION, before *Cowper, Special Judge,* at July Special Term, 1930, of DUPLIN.

On the evening of 18 January, 1930, about 5:00 or 5:15 o'clock, Stephen English ran screaming to the house of a neighbor who lived about 300 yards away, saying: "Berta is dead. Run to my house. Blood is all over the floor." Soon after this alarm was given the whole neighborhood was in an uproar. The body of Berta English, wife of defendant, was found in her home lying on the floor near the fireplace.

Her head was lying in a puddle of blood. Three chairs were turned over. Some bureau drawers were open and one of them lying on the floor, and clothing and other things scattered over the floor. There was an iron poker, apparently made out of a vehicle tire, at the fireplace near the body of deceased. There was blood on the poker and red hair thereon. The deceased was red headed. On top of the scalp of the dead woman was a two-inch laceration down to the skull. The right ear was completely severed to the bone. The left lower jaw bone was fractured. The clothing of the dead woman was pulled up under her breast. "Her hips, thighs and knees were spread apart. Her bloomers were down to the knee with the left thigh torn."

The doctor, who made an examination of the body, testified that in his opinion there was no evidence of rape, and that the deceased had been dead at least four to six hours. There was a bruise on her hip and a bruise on her throat and on her chest. There was soot on her left jaw bone.

The defendant offered evidence tending to show that on Sunday, the day after the murder, a negro by the name of Dave Locke, was arrested in Wilmington, and this negro, in the presence of three Wilmington officers, admitted that he killed Berta English "and described the house, the conditions of the body and the entire condition of the woman" as she was afterwards found. This negro also stated that he killed Mrs. English with a fire-poker and tore her bloomers off, and stated that the fire-poker was bent at one end, and that in the struggle with Mrs. English he lost two buttons from his overalls, and that he produced these buttons and showed them to the officers at the time of the confession. The statement of the suspect gave "a pretty good description of the house and of the roads about the premises."

Thereafter, on 19 January, 1930, a warrant was issued for Locke, charging him with the murder of Mrs. English. This warrant was returnable before a magistrate. The record is not clear, but apparently the negro was discharged, and has since not been seen about that part of the country. All of the foregoing evidence was excluded by the court.

Thereafter another negro by the name of Dave Brockington was arrested and charged with the murder of Mrs. English.

Subsequently, on 5 March, 1930, the defendant, Stephen English, husband of the deceased woman, was arrested and charged with the murder of his wife. The star witness for the State was Raeford Albertson, who testified in substance that on 18 January, about 10 o'clock in the morning he went to the home of the defendant; that he went into the house and talked to the defendant and his wife until about twelve o'clock and ate dinner there. Witness testified that he then went out on the

porch and the defendant came out behind him and said, "Less go to the stables." The State's witness then continued: "I went out there with him and he approached the subject about Bertie Brinson. He told me about meeting her at the show and what a good time he had, and that she was the sweetest thing to him he ever laid eyes on. Said he never loved anybody but her—that he would love her the longest day he lived. . . . I don't love my wife except as a friend. I will give you my Ford if you will kill her. I will give you $50 in money. I haven't got the money, but I have got the stuff that I can get it out of." I said: "I can't do that. If you have got that in your head, go get your suitcase and leave her, but don't do that." He said: "No, I can do it and never be caught up with." He told me he had tried to destroy her in other ways, but it would not work. He said: "I am going to work a sure plan this time." We were in the yard and he got a shovel handle, something like a yard or a yard and a half long and went out to the front of the house. I said: "I got to go." He said: "If you will go with me by Winnie McGee's, I will go with you," and he went in the house with that shovel handle, and pretty soon after he got in the house, I heard a lick, something like a shovel handle, and I left the porch and went to the stable, and in about fifteen or twenty minutes he came out with a pair of streaked overalls on. When he went in he had on light pants. When he got near me, he pulled out the stick from his overall's leg and carried the stick in the stable and put it down and came on and said: "Let's go," and we went to Winnie McGee's, and he looked at me and said: "I think I have got her fixed so she won't tell on me, and if you do, I'll get you."

This same State's witness testified that about a week after the death of Mrs. English he went by the defendant's house about night, and the defendant went in the house and built a fire and made a fire in the stove and then went in the kitchen loft and got a pair of pants down with blood on them . . . and pushed them under the wood in the fire and went to the stable and got the stick and cut that up and put it in the stove and looked at me and said: "Thank God, I have not got to worry about anybody ever seeing them," and as we came on that morning from his father's, he got against the graveyard and said: "Walk to the graveyard with me," and we went up to the grave where she was buried and the flowers were fresh on the grave and he said: "Look at it," and tears came in his eyes and he said: "If I had it to do over again what I have done, I would kill myself before I'd do it." On cross-examination this witness testified that Mr. and Mrs. English were very pleasant to each other. He never heard a cross word between them except on one occasion. Witness further testified on cross-examination that when the negroes were tried before the magistrate that he was a

witness and was sworn as a witness and testified that he and the defendant left the defendant's house and went some distance to a barber shop and left Mrs. English in the house, and that as defendant was leaving Mrs. English gave him some eggs and told him, "Get me some coffee and I will be at my mother's when you come back." The State's witness explained the contradictions in his testimony by saying: "I swore to a lie for Stephen (the defendant) and against two negroes who were on trial." There was much testimony to the effect that the star witness for the State was a boy of bad character.

The defendant was a witness in his own behalf and testified that he did not kill his wife. The father, mother and relatives of the dead woman all testified in behalf of defendant. There were many witnesses who testified that defendant was a man of good character. The young girl referred to in the testimony of the leading State's witness, testified in behalf of defendant, denying the imputation against her character, and there were many witnesses who testified that she was a girl of good character.

The jury convicted the defendant of murder in the second degree "asking the mercy of the court." Upon the verdict the court pronounced judgment that the defendant be confined in the State's prison for a term of not less than twenty years nor more than thirty years.

From the foregoing judgment defendant appealed.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*Gavin & Johnson, Geo. R. Ward, N. B. Boney and Sutton & Greene for defendant.*

BROGDEN, J. Is the voluntary confession of a third party, made to officers of the law, that he killed the deceased, detailing the circumstances, competent evidence in behalf of the defendant charged with the murder?

The admissibility of confessions of a third party in criminal actions has been bitterly assailed and warmly defended by courts and text-writers. The numerical weight of authority excludes such testimony. About one hundred years ago it appears in *S. v. May,* 15 N. C., 328, that a defendant was charged with stealing a slave. At that time this was a capital felony in North Carolina, and the defendant having been convicted, the judgment of death was pronounced against him. In that case the defendant offered testimony that another man had confessed to stealing the slave and had made compensations therefor. The testimony was rejected. The Court said: "Except the facts of the respective residences of the parties, which of themselves do not tend to establish

guilt in either of the parties, it is obvious that all the evidence, as well that received as that rejected, consists of the acts and declarations of other persons, to which neither the State nor the prisoner is privy. I think the whole of it was inadmissible. The confession is plainly so. It is mere hearsay. It may seem absurd to one not accustomed to compare proofs, and estimate the weight of testimony according to the tests of veracity within our power, that an unbiased confession of one man that he is guilty of an offense with which another is charged, should not establish the guilt of him who confesses it, and by consequence, the innocence of the other, but the law must proceed on general principles; and it excludes such a confession upon the ground that it is hearsay evidence—the words of a stranger to the parties, and not spoken on oath. Indeed, all hearsay might have more or less effect, and from some persons of good character, well known to the jury, it might avail much. Yet it is all rejected, with very few exceptions; which do not in terms or principle extend to this case. Even a judgment upon the plea of guilty could not be offered in evidence for or against another, much less a bare confession. As a declaration of another establishing his own guilt, the confession of a slave might be used upon the same principle."

The *May case* is the original legal patriarch of an increasing line of legal descendants in this State. *S. v. Duncan,* 28 N. C., 236; *S. v. White,* 68 N. C., 158; *S. v. Gee,* 92 N. C., 756; *S. v. Lane,* 166 N. C., 333; *S. v. Church,* 192 N. C., 658. The states holding the same interpretation of the law are assembled in a note in the decision of *Donnelly v. U. S.,* 228 U. S., 243. The minority view is clearly and concisely stated by *Mr. Justice Holmes,* who wrote a dissenting opinion in the *Donnelly case, supra,* in which *Justices Lurton* and *Hughes* concurred. *Justice Holmes* said: "The confession of Joe Dick, since deceased, that he committed the murder for which the plaintiff in error was tried, coupled with circumstances pointing to its truth, would have a very strong tendency to make any one outside of a court of justice believe that Donnelly did not commit the crime. I say this, of course, on the supposition that it should be proved that the confession really was made, and that there was no ground for connecting Donnelly with Dick. The rules of evidence in the main are based on experience, logic and common sense, less hampered by history than some parts of the substantive law. There is no decision by this Court against the admissibility of such a confession; the English cases since the separation of the two countries do not bind us; the exception to the hearsay rule in the case of declarations against interest is well known; no other statement is so much against interest as a confession of murder, it is far more calculated to convince than dying declarations which would be let in to hang,

a man; . . . and when we surround the accused with so many safeguards, some of which seems to me excessive, I think we ought to give him the benefit of a fact that, if proved, commonly would have such weight. The history of the law and the arguments against the English doctrine are so well and fully stated by Mr. Wigmore that there is no need to set them forth at a greater length. 2 Wigmore, Evidence, secs. 1476, 1477."

The Supreme Court of Appeals of Virginia in *Hines v. Commonwealth,* 117 S. E., 843, assails the whole majority doctrine, and summarizes the attack in these words: "The reasons given by the authorities for rejecting proof of such evidence seems to us unsatisfactory and entirely arbitrary; and, no rule of property being involved, we do not think it is even yet too late to abandon the unsound precedents and follow the rule of right and reason."

The Supreme Court of Kansas in *State v. Scott,* 235 Pac., 380, granted a new trial for failure to admit evidence in behalf of a husband on trial for killing his wife, that a "mysterious stranger might have committed the murder." A petition to rehear was filed and the former decision adhered to. Two *Justices,* however, dissented.

The Supreme Court of Colorado in *Moya v. People,* 244 Pac., 69, adopts the majority view with two *Justices* dissenting. The Supreme Court of Kentucky in *Etly v. Commonwealth,* 113 S. W., 896, adopts the minority view in a case in which the husband was on trial for killing his wife.

The great jurist who wrote the *May case* confesses that the holding might seem absurd to a layman, "but the law must proceed on general principles," and hence if proffered testimony is technically and legalistically hearsay, then the technical interpretation must prevail. Furthermore, the suggested possibility that some man accused of crime would procure a confession of guilt by a slave and thus escape punishment, might have been a consequence which law-writers of a hundred years ago were seeking to avoid.

The writer of this opinion, speaking for himself, strings with the minority, but it was the duty of the trial judge to apply the law as written, and the exceptions of the defendant are not sustained.

Certain exceptions were taken to evidence relating to the association of defendant with a school girl. These exceptions are not sustained, for the reason that while proof of motive was not necessary, yet it has been held with practical unanimity that such circumstances are competent in cases similar to the one now under consideration. Exceptions were also taken to evidence tending to show that the father of the deceased woman, who was a witness for defendant, had attempted to bribe a colored man to implicate two other parties. These exceptions are not sustained. *S. v. Patterson,* 24 N. C., 346; *S. v. Beal,* 199 N. C., 278.

The record is voluminous and no impartial mind can review it carefully without an impression of grave doubt. Obviously, such an impression was in the minds of the jurors who convicted the defendant of murder in the second degree and prayed the mercy of the court, but the trial judge has correctly applied the law as written.

No error.