STATE OF NORTH CAROLINA v. PAUL AUSTIN HAYWOOD, JOHN WILLIAM BROWN, JAMES LEWIS WATKINS, AND RONALD EUGENE COVINGTON

No. 83

(Filed 28 November 1978)

1. Assault § 14.2; Robbery § 4.3— assault with deadly weapon—robbery with firearm—sufficiency of evidence

In a prosecution against four defendants for assault with a deadly weapon and robbery with firearms, the following evidence was sufficient to support a finding by the jury that the four defendants were friends acting in concert, that each was aiding and abetting the others in the robbery, and that all were principals in the crimes charged: defendant Brown was identified by the victim as the person who beat him in the face with a "long type weapon" and defendant Watkins as the man wearing a "yellow tank top" whom a witness saw a few minutes later walking away from the victim as he lay in the door of the store crying for help; defendant Watkins owned the automobile which several witnesses saw at the grocery store before and after the victim was shot; at least three and perhaps four of the defendants went into the grocery store; when the getaway car would not crank after defendants left the store, Watkins remained to start the car while the others fled behind the store where Watkins picked them up; when a patrolman spotted the getaway car, all

defendants except the driver were crouched down in the car; and when all defendants had been removed from the car, a hoe handle and three guns, including the one used in the assault, were found in plain view on the floorboard.

**2. Criminal Law § 35— declaration against penal interest—no right of codefendants to have statement admitted**

In a prosecution of four defendants for assault with a deadly weapon and robbery with firearms, the trial court did not err in excluding an alleged declaration against penal interest made by one defendant on the ground that he was not warned of his constitutional right to remain silent, and the other defendants were not entitled to have the statement admitted to exonerate them, since the statement in fact only implicated the defendant who made it and did not exonerate the other defendants, and the court's ruling in excluding the statement was in accord with Supreme Court decisions holding that the defendant in a criminal case may not introduce in evidence a third person's extrajudicial confession that he committed the crime for which the defendant is being tried.

**3. Criminal Law § 35— declarations against penal interest—conditions for admission**

It is in the best interests of the administration of justice that declarations against penal interest be admitted under the following conditions: (1) The declarant must be dead; beyond the jurisdiction of the court and the reach of its process; suffering from infirmities of body or mind which preclude his appearance as a witness either by personal presence or by deposition; or exempt by ruling of the court from testifying on the ground of self-incrimination, and the party offering the declaration must show that he has made a good-faith effort to secure the attendance of the declarant; (2) The declaration must be an admission that the declarant committed the crime for which defendant is on trial, and the admission must be inconsistent with the guilt of the defendant; (3) The declaration must have had the potential of actually jeopardizing the personal liberty of the declarant at the time it was made and he must have understood the damaging potential of his statement; (4) The declarant must have been in a position to have committed the crime to which he purportedly confessed; (5) The declaration must have been voluntary; (6) There must have been no probable motive for the declarant to falsify at the time he made the incriminating statement; and (7) The facts and circumstances surrounding the commission of the crime and the making of the declaration must corroborate the declaration and indicate the probability of trustworthiness. The admissibility of a declaration against penal interest will be determined by the trial judge upon a voir dire out of the presence of the jury.

**4. Criminal Law § 113.6; Robbery § 5.4— four defendants—determination of guilt individually—lesser offenses—jury instructions proper**

Defendants' contentions that the trial judge pushed the jury to a verdict against all four defendants, never gave the jury an opportunity to convict less than all the defendants and erred in failing to submit lesser included offenses of common law robbery and accessory after the fact to the robbery and assault are without merit, since there was no intimation by the judge that the jury

should find any or all of the defendants guilty; the judge gave separate man-
dates relating to each charge and each defendant individually so that the jury
could not have understood that, if they found one defendant guilty, they would
have to find all four guilty; and all the evidence tended to show that the rob-
bery with which defendants were charged was a robbery with firearms, and
the uncontradicted evidence of the State tended to show that all of the defend-
ants conspired to rob the store and those who did not enter were outside
ready to assist those who did.

Justice BRITT took no part in the consideration or decision of this case.

APPEAL by defendants under G.S. 7A-27 from *Martin (Perry)*,
*J.*, 13 December 1976 Session of the Superior Court of SAMPSON,
docketed and argued as Case No. 25 at the Fall Term 1977.

Upon indictments, proper in form, each of the four defend-
ants was prosecuted for the crimes of assault with a deadly
weapon with intent to kill and inflicting serious injury (G.S.
14-32(a) (1969)) and for robbery with firearms (G.S. 14-87, Cumm.
Supp. 1975). Upon the State's motion, and with defendants' con-
sent, the four cases were consolidated for trial pursuant to G.S.
15A-926(b)(2) (1975). Linda Evette Watkins, the wife of defendant
Watkins, was a fifth defendant. She entered a plea of guilty of
common-law robbery and was, therefore, not a codefendant in this
case.

Defendants offered no evidence. The State's evidence tended
to show:

On 7 September 1976 Aaron Jackson, the operator of
Jackson's Red & White Grocery on College Street in Clinton,
opened his store sometime between 7:30 and 8:00 a.m. Shortly
thereafter a man grabbed him from behind and hollered, "Get the
money; get the money!" When his assailant threw him to the floor
Jackson's .38 caliber pistol (serial number 75J816, State's Exhibit
1-a) fell from his rear pocket, and a second man picked it up. The
two men then started beating on Jackson and seriously injured
him. He was stomped and shot through the left arm and finger,
and finally he was shot in the back with his own pistol when he
ran to the door. Prior to the robbery Jackson, 56 years old, had
been in perfect health. The shooting left him paralyzed from the
waist down. Jackson's pistol, the only item taken from the store,
was valued at $115.00.

Jackson identified defendant Brown as the man who was beating him in the face with a hoe handle, which he described as "a long type weapon." However, he could neither identify the man who grabbed him from behind nor say how many persons were in his store at the time of the robbery. Jackson testified that while the two men were assaulting him "there was one that was running down the aisle, that [he] didn't see . . . it sounded like he was running toward the back of the store."

Several witnesses testified that on the morning of 7 September 1976 they saw a green automobile occupied by five black persons in the parking lot at the Red & White Grocery. Gretha Jackson passed within one foot of this car as she went in and out of the store before going to her work across the street. The right front door of the car was open, and she saw a man under the wheel, a woman beside him. She also observed three men in the back seat. Miss Jackson, who later identified this woman as Linda Evette Watkins, heard sounds "like firecrackers" as she crossed the street after leaving the store, but she did not look back.

James Johnson, the driver of a city garbage truck, also saw an automobile, which he described as a green and black 1970 Monaco, parked beside "the Red & White." He observed three black males sitting in the back seat, a black male in the driver's seat, and a black female sitting beside him. "The car had D.C. License tags." After Johnson had driven around the block and passed back by the Red & White he parked farther down on College Street near its intersection with Highway 701. While there the car he had seen parked at the Red & White passed him and turned north on Highway 701 at the stop light. At that time he saw only one person in the car.

On the morning of 7 September 1976 Mrs. Faye Gaddy and her young son were at the Red & White waiting for Mr. Jackson to open the store. At that time she noticed a green Dodge Monaco with an out-of-state license in the parking lot. Outside the store, she saw a black man wearing "a yellow tank top." After taking her son to school, she drove back by the Red & White and, as she did so, "she heard someone hollering, 'Help me, help me.'" She slowed down and observed Mr. Jackson lying in the door and "this same black male was walking away from him." This man got

into the car and then "picked up three more [black people] around behind the store."

That night, from a group of photographs, Mrs. Gaddy picked out defendant Watkins as the man she had seen at Jackson's Store that morning. In the photograph he was not wearing the yellow tank shirt he had worn that morning. In court she testified that "[s]he is as positive as she can be that James Watkins is the black man she saw at the Red & White and there is only a very slim chance of a mistake."

Another witness, Bernice Gautier, who owns a body shop about 250 feet from Jackson's Red & White, "heard a shooting over at Jackson's and heard Mr. Jackson begging for help." He observed Jackson lying about halfway out of his door and then saw two or three people "come out this side of the grocery," run to a dark green Dodge, and then jump out of the car because it would not crank. However, one man stayed in the car and got it started. He then drove around to the back of the store, got the others, and pulled out of the driveway headed toward Highway 701. All the people Gautier saw were black and the car had "out-of-state license tags."

Captain Leo Benson and Lieutenant Goodwin of the Clinton Police arrived at the Red & White soon after 8:00 a.m., before Mr. Jackson was taken to the hospital. Near the door, on the floor between aisles 3 and 4, Lieutenant Goodwin found a .32 caliber bullet (Exhibit 5-b). Frances Warrick, an employee of Mr. Jackson's, found a .38 bullet (Exhibit 5-a) on a shelf of a gondola in the store and gave it to Lieutenant Goodwin. After talking with Mrs. Gaddy, Gautier, and Johnson, who gave him information substantially in accord with their testimony as set out above, Benson radioed the police dispatcher "to put it on the pen system" that the green Dodge, which had been seen at the grocery at the time Jackson was shot, was traveling north on Highway 701 toward Newton Grove, I-95, and Smithfield.

About 8:50 a.m. Highway Patrolman Mason was instructed to look for a two-toned green Dodge with D.C. license plates and occupied by five black persons. He encountered a two-toned green Dodge with D.C. license plates on Highway 701, five or six miles north of Newton Grove. When Mason came upon the car it was being followed by a Newton Grove Police car, the driver of which

"pointed toward the car." At that time, however, the only visible occupants of the Dodge were a man and woman in the front seat. The vehicle stopped upon Mason's signal and the driver, defendant Watkins, got out of the car. He was wearing a gold or yellow tank or tee shirt and Bermuda shorts. When Mason, who was armed with a pump shotgun, saw a knee or leg move in the back seat he backed up and ordered Watkins to lay down on the ground. Two other patrolmen soon arrived and Watkins was handcuffed. Then, using the public address system the patrolmen ordered the other occupants of the car to come out one at a time with their hands up.

After all defendants were handcuffed Mason went to the car they had just vacated. Its motor was still running and three pistols were visible on the floorboard in the rear. A .32 caliber Harrington-Richardson pistol (Exhibit 2-a) was to the left of the hump; a longer gun, a .22 caliber Harrington-Richardson (Exhibit 3-a) was on the hump, about halfway under the seat; the .38 caliber pistol (Exhibit 1-a) was to the right of the hump.

Without touching anything in the car, Mason cut off the motor, locked the car and summoned a wrecker. In accordance with Mason's instructions, the operator, Cecil Fields, deposited the locked car at Hall's Garage. He then delivered the keys to Lieutenant Goodwin, who had been assigned to investigate the robbery and shooting at Jackson's Red & White.

Sometime after 9:00 a.m. on 7 September 1976 Captain Benson saw defendant Watkins "at the Magistrate's Office." He was wearing a yellow-gold tank shirt and Bermuda shorts. That afternoon at the police department Benson photographed all the defendants. At their request he went to Hall's Garage, removed their clothes from the trunk of the Dodge, and took them to defendants at the jail. There each man identified his own clothing and Watkins got his wife's clothes.

While at Hall's Garage, Goodwin examined the pistols in the back seat of the car. The .32 caliber pistol (Exhibit 2-a) contained six bullets, two fired and four unfired. The .38 pistol (Exhibit 1-a) was loaded with five shots, two fired and three unfired. The serial number of this pistol identified it as belonging to Mr. Jackson. The .22 caliber gun (Exhibit 3-a) held nine rounds but contained only six, none of which were fired. Goodwin also found in the back

seat on the left side a part of a hoe handle (Exhibit 19). In the glove compartment of the Dodge, he found the title to the automobile which showed it to be registered in the names of James Lewis Watkins and Catherine Watkins, 2716 Second Street, S.E., Washington, D.C. Also in the glove compartment was a citation issued on 7 September 1976 by a Virginia State Patrolman directing defendant Watkins to appear in the General District Court of Manassas, Virginia on 4 October 1976 to answer the charge of speeding 72 MPH in a 55 MPH zone, "clocked by radar."

Sometime during the morning of September 7th, Dr. Cooper Howard operated on Mr. Jackson to repair internal organs which had been penetrated by a .38 caliber bullet. He removed a bullet (State's Exhibit 4-b) from the left side of Jackson's body just below the rib cage and delivered it to Lieutenant Goodwin. A ballistic expert's examination of this bullet showed it to have been fired from Mr. Jackson's .38 caliber pistol, which was one of the three pistols found on the back floorboard of defendant Watkins' car.

The expert also found that the bullet (Exhibit 5-a), which Frances Warrick had discovered on the gondola shelf in the grocery, was fired from Mr. Jackson's .38 pistol. He further determined that the bullet, Exhibit 5-b, which Lieutenant Goodwin had picked up between aisles 3 and 4 in the store, had been fired from Exhibit 2-a, the .32 pistol which was on the left side of the back floorboard of defendant Watkins' automobile when Patrolman Mason stopped it.

On the morning of 7 September 1976 defendants were taken before a magistrate and advised of the charges against them. Thereafter Lieutenant Goodwin advised them of their constitutional rights by reading them from a "Rights Form" which purported to state the Miranda warnings. Goodwin testified he had received "some written statements" from defendants, but the State did not offer them in evidence.

However, on cross-examination, in response to questions from Mr. Thompson, the attorney for defendants Brown and Covington, Lieutenant Goodwin testified that he had these written statements in his briefcase; that he had obtained a signed waiver of rights and statement from only defendant Haywood. The

others "would not and did not sign the waiver." When Mr. Thompson asked Lieutenant Goodwin to relate the statement which Haywood made to him, Mr. Lanier, counsel for defendants Haywood and Watkins, objected on behalf of defendant Haywood only. He specifically stated that defendant Watkins had no objection to the statement.

After examining the "Rights Form" from which Goodwin had read "their rights" to Haywood and the other defendants, Judge Martin sustained defendant Haywood's objection because the form did not contain the warning that any statement a defendant made to the officers could be used against him in court.

At Mr. Thompson's request, out of the hearing of the jury, Lieutenant Goodwin was permitted to read into the record the following statement, which he testified that Haywood had made to him:

"I came to Clinton from D.C. with James and Linda Watkins, John Brown and Ronald Covington. We stopped at Jackson's Red & White in Clinton. I went in to rob the store but Mr. Jackson put up such a fight that I shot him and ran out of the store. Paul Haywood, 5936 East Capitol Street, Northeast, Washington, D.C. Witness, Lieutenant J. H. Goodwin."

Defendants offered no evidence.

The jury found each defendant guilty of the crimes of robbery with a firearm and assault with a deadly weapon inflicting serious injury. On the robbery charge each defendant was sentenced to life imprisonment; on the assault charge each received a sentence of 10 years imprisonment to begin at the expiration of the sentence imposed for robbery with a firearm. Each defendant appealed.

*Rufus L. Edmisten, Attorney General, and George J. Oliver, Assistant Attorney General, for the State.*

*E. C. Thompson III, Attorney for John William Brown and Ronald Eugene Covington defendant-appellants.*

*Russell J. Lanier, Jr., for Paul Austin Haywood and James Lewis Watkins, defendant-appellants.*

SHARP, Chief Justice.

[1]  We examine first defendants' assignment of error No. 14, that the trial court erred in denying their respective motions for judgments as of nonsuit, made at the close of all the evidence. G.S. 15-173 (1975). We consider this assignment under the established rule that upon a motion to nonsuit the trial court must view the evidence in the light most favorable to the State, take it as true, and give the State the benefit of every reasonable inference to be drawn from it. *State v. Goines*, 273 N.C. 509, 160 S.E. 2d 469 (1968).

It is immediately apparent from an examination of the facts that the court properly overruled the motion as to defendants Watkins and Brown. Defendant Brown was the man whom Jackson identified in court as the one beating him in the face with the "long type weapon." Defendant Watkins was the man wearing the "yellow tank top," whom Mrs. Gaddy saw outside Jackson's grocery when she went there before taking her son to school. After delivering him she drove back by the store where she again saw Watkins as he walked away from Jackson lying in the door crying for help. Furthermore, Watkins owned the green and black 1970 Dodge Monaco with the D.C. license which several witnesses saw at the grocery before and after Jackson was shot. It was in this car that the four defendants were traveling when they were arrested less than an hour after the robbery and shooting, and in which Jackson's .38 pistol was found.

Defendants Haywood and Covington, however, contend that the evidence admitted at the trial fails to place either of them in the store or to show that they were acting in concert with Brown and Watkins. Haywood correctly asserts that his alleged confession to Lieutenant Goodwin, having been ruled incompetent ("because the constable blundered") "in no way incriminates him" legally. Haywood and Covington rely upon *State v. Aycoth and Shadrick*, 272 N.C. 48, 157 S.E. 2d 655 (1967). As to them, they maintain that case is indistinguishable from this one. They argue, therefore, that their presence with Brown and Watkins immediately before and after the assault and robbery is insufficient to establish their complicity in these crimes.

The principle for which *Aycoth* is so often cited is firmly established law: "Mere presence at the scene of a crime does not

make one guilty as a principal or as an aider and abettor or as an accessory before the fact. *State v. Aycoth*, 272 N.C. 48, 157 S.E. 2d 655." *State v. Eakins*, 292 N.C. 445, 450, 233 S.E. 2d 387, 390 (1977). In *Aycoth*, the two defendants were jointly indicted and convicted for the armed robbery of Mrs. Keith Stevenson, who was in charge of Outen's Grocery. The State's evidence tended to show: The defendant Shadrick was a passenger in the defendant Aycoth's car when he stopped at Outen's and went into the store, leaving Shadrick in the car. The robbery occurred inside the store, where Aycoth remained no more than two or three minutes. There was no evidence that Shadrick ever moved from where he was sitting on the right side of the front seat of the car. Mrs. Stevenson testified she could see Shadrick, and he could have seen her through the plate glass window, but he never did look around. There was no evidence that Shadrick did observe what was taking place inside the store or that he had a weapon of any kind. After robbing Mrs. Stevenson, Aycoth concealed his pistol before he left the store and returned to the car. When the defendants were arrested several hours later there was no evidence that Shadrick shared in the hundred dollars which Aycoth took from Mrs. Stevenson beyond the fact that he had fifteen dollars and some change on him. Weapons were found under the seat of Aycoth's car, but there was no evidence that Shadrick knew they were there.

In reversing Shadrick's conviction this Court said: "Although there are circumstances which point the finger of suspicion towards Shadrick, we are constrained to hold that the evidence is insufficient to warrant a verdict that he is guilty of the alleged armed robbery as an aider and abettor of Aycoth." 272 N.C. at 51, 157 S.E. 2d at 657-8. *See also State v. Swaney*, 277 N.C. 602, 612-13, 178 S.E. 2d 399, 405-6 (1970), *appeal dismissed*, 402 U.S. 1006 (1971).

In the instant case, however, the evidence is not as sparse as it was in *Aycoth*; it does more than point the finger of suspicion toward Haywood and Covington. Competent evidence sustains findings (1) that these two defendants were present, either in or sufficiently close to Jackson's grocery, to aid the perpetrators in the commission of the robbery should their assistance become necessary and (2) that their intent to do so was communicated to the actual perpetrators. "The communication or intent to aid, if

needed, does not have to be shown by express words of the defendant but may be inferred from his actions and from his relation to the actual perpetrators." *State v. Sanders*, 288 N.C. 285, 291, 218 S.E. 2d 352, 357 (1975), *cert. denied*, 423 U.S. 1091 (1976). "[W]hen the bystander is a friend of the perpetrator and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement, and in contemplation of law this is aiding and abetting." *State v. Holland*, 234 N.C. 354, 358, 67 S.E. 2d 272, 275 (1951). *See State v. Rankin*, 284 N.C. 219, 223, 200 S.E. 2d 182, 185 (1973) and cases cited therein.

It is a fair inference from the State's evidence that the four men and one woman who occupied the green Dodge on 7 September 1976 were "friends" who had left Washington, D.C. together on a joint venture to the south. Washington was the residence of Watkins, the owner of the car, and his wife, Linda. All occupants had clothes in the trunk of the car, and they arrived together at the Red & White before Jackson opened the store.

According to all the testimony at least three of the defendants—perhaps four—went into the store. Jackson testified that while two were beating on him he heard a third person running down the aisle. Mr. Gautier, who heard the shooting and Mr. Jackson's cries for help, testified that he saw two or three people come out of the store and run to the Dodge. "When it would not crank," they jumped out and ran back around the building. The driver, however, stayed with the car, got it started, drove around the back and got the others. He then drove toward Highway 701. Mrs. Gaddy also saw Watkins drive around behind the store and pick up "three more." As the car stopped for the light at Highway 701, James Johnson could see only the driver. The other four occupants were obviously all crouched in the seat or floorboard.

When Patrolman Mason spotted a two-toned Dodge with a D.C. license on Highway 701 he could see only a man and a woman in the front seat. After he had stopped the car and had seen a knee move in the back, he discovered Haywood, Brown, and Covington lying down in the seat—an unusual posture of choice for innocent persons unaware of any reason why officers of the law would be interested in them. When the occupants of the

back seat had been removed, Mason observed in plain view on the floorboard four deadly weapons: a hoe handle, two Harrington-Richardson pistols (Exhibit 2-a, of .32 caliber; Exhibit 2-b, of .22 caliber), and a .38 caliber pistol, later identified as the pistol which had been taken from Mr. Jackson. The .32 caliber pistol had been used in the robbery, for a bullet fired from it was found in the aisle. Indubitably, all the occupants of the Watkins vehicle knew of the presence of the two Harrington-Richardson pistols and the hoe handle and that they were to be used in the robbery of the Red & White grocery.

We conclude that this evidence is sufficient to support a finding that the four defendants were "friends" acting in concert, that each was aiding and abetting the others in the robbery, and that all were principals in the crimes charged. We hold, therefore, that the motion for nonsuit was properly overruled.

[2] We next consider assignment of error No. 5 in which defendants Watkins, Brown and Covington challenge the trial judge's ruling excluding an alleged declaration against penal interest made by their codefendant Haywood.

On cross-examination defendants Watkins, Brown, and Covington sought to elicit from Lieutenant Goodwin the oral statements, and the contents of a written statement, which defendant Haywood had given the police with reference to his involvement in the robbery and shooting of Jackson. The trial judge sustained defendant Haywood's objection to this evidence, and that ruling is the basis of assignment of error No. 5.

Haywood's statement was that he had traveled from Washington, D.C. to Clinton with the other defendants; that, after arriving there, they stopped at Jackson's Red & White and he went in to rob the store; that Jackson put up such a fight he shot him and ran out.

The district attorney, conscious of the fact that the officers had obtained Haywood's confession without having warned him of his constitutional right to remain silent, did not offer his incriminating statement in evidence. The State thus avoided a confrontation with *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966), and the cases having been consolidated, perhaps a confrontation with *Bruton v. United States*, 391 U.S.

State v. Haywood

123, 20 L.Ed. 2d 476, 88 S.Ct. 1620 (1968). *See* G.S. 15A-927(c)(1) (1973); *State v. Heard and Jones*, 285 N.C. 167, 203 S.E. 2d 826 (1974); *State v. Fox*, 274 N.C. 277, 291, 163 S.E. 2d 492, 502 (1948). Here we note that when the district attorney moved to consolidate the cases for trial each defendant announced that he had no objection to the consolidation. The judge allowed the motion and thereafter no one moved for a severance at any time during the trial. G.S. 15A-927(c)(2)b.

Defendants Watkins, Brown, and Covington concede that Haywood's confession was inadmissible against him because he had not received the full *Miranda* warning. They assert, however, that Haywood's statement was "made voluntarily"; that "there [is] nothing to indicate his statement was not true"; that it tended to exonerate them; and that, even though its admission would have incriminated Haywood, fair play required the judge to allow the jury to hear it. Thus, they contend that they are entitled to a new trial because the statement was excluded. For the reasons hereafter stated these contentions cannot be sustained.

It is true that Haywood's sparse statement does not specifically implicate any other defendant in the armed robbery and shooting, but neither does it purport to exonerate them from complicity in those crimes. The statement does not negate the State's evidence tending to show that at the time of the robbery all the defendants were engaged in a joint enterprise, aiding and abetting each other. On the contrary, Haywood's statement is entirely consistent with the State's theory of the prosecution. Indeed, when it is considered in conjunction with the evidence relating to the weapons found in Watkins' car, the eyewitness testimony that Watkins and Brown were in the store at the time of the robbery, and the circumstances attendant upon the defendants' arrest, it appears that the likely impact of Haywood's statements, had they been admitted, would have been to bolster the State's case against all the defendants. Its exclusion, therefore, was not prejudicial. Furthermore, the trial court's ruling was clearly in accord with the decisions of this Court holding inadmissible declarations against penal interest.

For more than a century this Court, presumably fearful that a different rule would open "a door to a flood of perjured witnesses falsely testifying to confessions that were never

made",[1] has adhered to the rule that the defendant in a criminal case may not introduce in evidence a third person's extrajudicial confession that he committed the crime for which the defendant is being tried.[2] Notwithstanding, we deem it appropriate to reevaluate these decisions in the light of developing trends in the law.

The first discussion of this rule appears in our reports in *State v. May*, 15 N.C. 328 (1833). In *May*, the defendant, Daniel May, was indicted for the larceny of a slave named Harry, whom he had allegedly sold in South Carolina. At his trial the defendant attempted to prove (1) that warrants had also been issued against William May and Hardy May for the theft of the slave; (2) that when the warrants were issued William May immediately fled the State and had not returned; and (3) that William had confessed he alone had stolen the slave. The trial court excluded the proffered evidence and the defendant was convicted. Upon appeal the Supreme Court affirmed the conviction, each of its three members voting to affirm and expressing his concurring views in a separate opinion.

The consensus was that the whole of the excluded evidence was inadmissible. Chief Justice Ruffin rejected the confession as "mere hearsay . . . the words of a stranger to the parties, and not spoken on oath . . . too uncertain, and too easily fabricated falsely for the purpose of deceiving, to be relied on or acted on in a Court." *Id.* at 332-33. Justice Daniel opined that the "hearsay declarations of William May that he committed the crime were not on oath, nor was there any opportunity of a cross-examination. The evidence, therefore, according to the plainest principles of law, was properly rejected." *Id.* at 334. Justice Gaston wrote: "The criminal act imputed to the prisoner might as readily be committed by many as by one. The question of William May's guilt or innocence was not necessarily connected with that of the guilt or innocence of Daniel. Both might be guilty, or both might be innocent, and a common guilty or a common innocence was as presumable as the guilt of one only. . . . The thing to be proved must not only be relevant, but the testimony offered must be such as the law sanctions. The issuing of a State's warrant

1. C. McCormick, Evidence § 255, 549-50 (1954).

2. 1 Stansbury, N.C. Evidence § 247 at 495 and cases cited in n. 57 (Brandis rev. 1973). *See* Annot., 35 A.L.R. 441 (1925); Annot., 48 A.L.R. 348 (1927).

against William and the prisoner, in which William is first named, of *itself* is no evidence, and, unless necessary to explain or contradict something properly in evidence, ought not to have been received. . . . I am of the opinion the whole of the testimony offered in order to show the taking by William was illegal." *Id.* at 339.

In *State v. English*, 201 N.C. 295, 159 S.E. 318 (1931), Justice Brogden, speaking for the Court, stated the determinative question to be, "Is the voluntary confession of a third party, made to officer of the law, that he killed the deceased, detailing the circumstances, competent evidence in behalf of the defendant charged with the murder?" Justice Brogden noting that the "numerical weight of authority excludes such testimony"[3] and that "the *May* case [supra] is the original patriarch of an increasing line of legal descendants in this State," answered the question No for the Court. However, in doing so, he said: "The writer of this opinion strings along with the minority, but it was the duty of the trial judge to apply the law as written, and the exceptions of the defendant are not sustained." *Id.* at 299, 300.

The last in the "line of the legal descendants" of *the May case* is *State v. Madden*, 292 N.C. 114, 232 S.E. 2d 656 (1977). In that case a third party, while in the State's prison, confessed that he had committed the crimes for which the two defendants were charged. A week later he gave the police a second statement which contradicted his first statement and implicated two other men. Further investigation revealed that neither of the confessions could be supported by known facts. The facts in *Madden* demonstrate the reasonableness of the courts' fear that the unrestricted admission of such confessions as a declaration against interest would open a spillway to a flood of perjured testimony.

When a defendant seeks to introduce a third person's extrajudicial confession as substantive evidence that he and not the defendant committed the crime, it is offered as a declaration against interest. The rules governing the admission of declarations against interest in this State are succinctly stated in 1 Stans-

___

3. *See* Annot, Admissibility, as against interest, of declarations of commission of criminal act, 162 ALR 446 (1946). *See also* Annot, Extrajudicial declaration of commission of criminal act as admissible in evidence where declarant is a witness or available to testify, 167 ALR 394 (1947). 29 Am. Jur. 2d Evidence § 620 (1967); 39 Fordham L. Rev. 136, 138 (1970); 56 Boston U.L. Rev. 148, 151 (1977); 22A C.J.S. *Criminal Law* § 749 (1961).

bury's N.C. Evidence § 147 (Brandis rev. 1973) as follows: "(1) The declarant must be dead or, for some other reason, unavailable as a witness. (2) The fact stated must have been against the declarant's interest when made, and he must have been conscious that it was so. (3) The declarant must have had competent knowledge of the fact declared. (4) There must have been no probable motive for the declarant to falsify. (5) The interest must be a pecuniary or proprietary (as distinguished from a penal one), and it is on this ground that the defendant in a criminal case is not permitted to show the confession of another person."

The "orthodox rule" restricting the admissibility of declaration against interest to declarations against pecuniary or proprietary interest has been much criticized.[4] The arguments in favor of admitting declarations against penal interest are (1) that a person's desire to avoid criminal liability is as strong as his desire to protect his economic interests and his declarations against penal interest are as trustworthy as those concerning his pocketbook, for "no other statement is so much against interest as a confession of murder"; (2) that since a conviction of crime ordinarily results in an economic loss, the traditional concept of a pecuniary interest could logically include one's penal interest; and (3) that it is a "barbarous doctrine" which would permit manifest injustice by not allowing an innocent accused to vindicate himself by introducing evidence of a third person's confession that he was the true culprit.[5]

The United States Supreme Court addressed the admissibility of declarations against penal interest in *Chambers v. Mississippi*, 410 U.S. 284, 300, 35 L.Ed. 2d 297, 311, 93 S.Ct. 1038, 1047 (1973). Mr. Justice Powell, writing the majority opinion, described

4. *See* Holmes, J., dissenting in *Donnelly v. United States*, 228 U.S. 243, 277-78, 33 S.Ct. 449, 461, 57 L.Ed. 820, 834 (1913); *People v. Spriggs*, 60 Cal. 2d 868, 36 Cal. Rptr. 841, 389 P. 2d 377 (1964); *People v. Edwards*, 396 Mich. 551, 242 N.W. 2d 739 (1976); *People v. Brown*, 26 N.Y. 2d 88, 308 N.Y.S. 2d 825, 257 N.E. 2d 16, 43 A.L.R. 3d 1407 (1970); *Howard v. Jessup*, 519 P. 2d 913 (Okla. 1973); *Hines v. Commonwealth of Virginia*, 136 Va. 728, 117 S.E. 843, 35 A.L.R. 431 (1923); 1 Stansbury, N.C. Evidence, § 147 at 495; C. McCormick, Evidence § 255 (1954); 5 Wigmore on Evidence § 1477, p. 360 (Chadbourn rev. 1940); L. Powers, The North Carolina Hearsay Rule and the Uniform Rules of Evidence, 34 N.C.L. Rev. 171, 197-198 (1956).

5. In *People v. Lettrich*, 413 Ill. 172, 108 N.E. 2d 488 (1952), the defendant's conviction was based solely upon his repudiated confession, which did not conform in material respects to the known facts. After noting the danger of perjury inherent in out-of-court confessions, the Supreme Court awarded a new trial because, *inter alia*, the trial judge had excluded a third person's declaration that he had committed the crime. The Court said, "The rule is sound and should not be departed from except in cases where it is obvious that justice demands a departure. But it would be absurd, and shocking to all sense of justice, to indiscriminately apply such a rule to prevent one accused of a crime from showing that another person was the real culprit merely because that other person was deceased, insane or outside the jurisdiction of the court." *Id.* at 178, 108 N.E. 2d at 492.

the exclusion of the declaration against penal interest while admitting declarations against pecuniary interests, as a "materialistic limitation."

In *Chambers,* the defendant was tried for the murder of a policeman who had been shot with a .22 caliber pistol. The State's evidence excluded the theory that more than one person participated in the shooting of the officer. At the trial "Chambers called one McDonald as a witness, laid a predicate for the introduction of his sworn out-of-court confession [which McDonald had given Chambers' attorney], had it admitted into evidence and read it to the jury." Upon cross-examination the State elicited from McDonald the fact that he had repudiated his confession. McDonald further testified, as he had done at his preliminary hearing, that he did not shoot the officer and that he had confessed only because an acquaintance, "Reverend Stokes," had promised him he would not go to jail and would share in the proceeds of a lawsuit which Chambers would bring against the town. McDonald denied the shooting and asserted that he was not at the scene but in a cafe down the street when the officer was shot.

Thereafter the trial judge (1) denied Chambers' motion that he be allowed to cross-examine McDonald as a hostile witness and (2) sustained the State's objection when Chambers attempted to introduce the declarations McDonald had made to three of his friends that he was the man who had shot the policeman. On appeal the Supreme Court held that Chambers had been denied due process by the trial judge's refusal (1) to permit him to cross-examine McDonald in order to test his recollection, to probe into the details of his alibi, or to "sift" his conscience so that the jury might decide for itself whether McDonald's testimony was worthy of belief; and (2) to allow in evidence the extrajudicial declarations which McDonald had made to three of his close friends that he was the man who had shot the officer.

Justice Powell emphasized the fact that the rejected hearsay statements bore persuasive assurances of trustworthiness and thus were well within the basic rationale of the exception for declarations against interest: "First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case — McDonald's sworn

confession, the testimony of an eyewitness to the shooting, and proof of his prior ownership of a .22 caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal interest rationale, each confession is in a very real sense self-incriminatory and unquestionably against interest."

The Supreme Court concluded that the result of the trial judge's exclusion of McDonald's declarations against his interest ("critical evidence"), coupled with his refusal to permit Chambers to cross-examine McDonald, was a denial of due process which entitled Chambers to a trial *de novo*. However, the Supreme Court carefully hedged the impact of its decision by the following statement: "In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the states in the establishment and implementation of their own criminal trial rules and procedures.[6] Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." *Id.* at 303, 35 L.Ed. 2d 313, 93 S.Ct. 1049.

Obviously the factual situation in *Chambers v. Mississippi* is not comparable to that of the instant case, in which no constitutional issues are raised. However, any reconsideration of the admissibility of declarations against penal interest must take *Chambers v. Mississippi* into account. As limited by the facts, a number of courts have accepted "the *Chambers* rule" into their evidentiary common law.[7]

*Chambers* aside, the recent trend among the states has clearly been to admit declarations against penal interest although there is a lack of uniformity with reference to the conditions

6. For comments on this statement see *Pitts v. State*, 307 So. 2d 473 (Fla. App. 1975); *Commonwealth v. Nash*, 457 Pa. 296, 324 A. 2d 344 (1974).

7. In *State v. Gardner*, 13 Wash. App. 194, 198-199, 534 P. 2d 140, 142 (1975), the "*Chambers* Rule" is stated as follows:

"The minimal evidentiary criteria which must be met before any declaration can be considered as rising to constitutional stature are these: (1) the declarant's testimony is otherwise unavailable; (2) the declaration is an admission of an unlawful act; (3) the declaration is inherently inconsistent with the guilt of the accused; and (4) there are such corroborating facts and circumstances surrounding the making of the declaration as to clearly indicate that it has a high probability of trustworthiness."

State v. Haywood

under which such declarations are admitted.[8] As stated in a thoroughgoing note, *Declarations Against Penal Interest: Standards of Admissibility Under an Emerging Majority Rule*, 56 Boston U.L. Rev. 148 (1976), "[t]he rule excluding declarations against penal interest has gradually eroded, and the number of states holding such declarations admissible has increased dramatically in recent years." *Id.* at 149. "The legislatures of seven states have adopted rules of evidence that permit the introduction into evidence of declarations against penal interest.[9] . . . The courts of 14 states have held declarations against penal interest admissible without legislative authorization.[10] . . . In addition the courts of [two states] have indicated a willingness to adopt the rule if presented with an appropriate case."[11]

Furthermore Section 804(b)(3) of the Federal Rules of Evidence (28 U.S.C.A. Appendix, Rules of Evidence, effective 1 July 1975) provides that if the declarant is unavailable as a witness "[a] statement [is admissible] which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." If the declarant "is exempt by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement," Rule 804(a)(1) declares him unavailable as a witness.

In the explanatory comment on Rule 804(b)(3) in S. Saltzburg and K. Redden, Federal Rules of Evidence Manual (2d ed. 1977), the editors emphasize the rule's requirement that if the criminal defendant offers evidence of a declaration against interest to ex-

---

8. Note, 39 Fordham L. Rev. 136, 139 (1970). *See State v. Larsen*, 91 Idaho 42, 47, 415 P. 2d 685, 691-692 (1966), for a succinct discussion of the trial and informative array of the cases.

9. 56 Boston L. Rev. 148, 149, n. 5 (1976) (California, Kansas, Nevada, New Mexico, Wisconsin, New Jersey, Utah).

10. *Id.*, Arizona, Hawaii, Idaho, Illinois, Maryland, Minnesota, Missouri, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, Texas, Virginia.

11. *Id.*, Maine and Washington.

culpate himself, corroborating circumstances must clearly indicate the trustworthiness of the statements. This requirement, they say, "is apparently an attempt to respond to the problem of one criminal with very little to lose trying to exculpate another," and they note that the cases interpreting this rule indicate "more than minimal corroboration is required." *Id.* at 602-603. *See United States v. Bagley,* 537 F. 2d 162, 34 A.L.R. Fed. 403 (5th Cir. 1976), *cert. denied,* 429 U.S. 1075 (1977); Annot., 34 A.L.R. Fed. 412 (1976).

Most courts, in admitting declarations against penal interest, have recognized that their unrestricted admission "would be an open invitation to perjury of a kind that would be most difficult to ascertain.[12] Thus, with few exceptions,[13] they have circumscribed the admission of such declarations with specific safeguards calculated to protect the interest of the State while affording the defendant "essential justice and common fairness." In general, more proof is required than the mere fact that another person has confessed to the same crime for which the defendant stands charged, and — as with other exceptions to the hearsay exclusionary rule — "the trial judge [on voir dire] must apply a threshold test" to determine "in his sound discretion" whether the declaration "bears the indicia of trustworthiness."[14]

Courts have selected various evidentiary criteria for determining the trustworthiness of an unavailable declarant's statement against penal interest. (*See* Note, 56 Boston L. Rev., supra at 158-180, where the cases are collected and analyzed.) There is general agreement, however, that to be competent evidence the declaration must be an admission of an unlawful act which is inherently inconsistent with the guilt of the accused. It must have had the potential of *actually* jeopardizing the personal liberty of the declarant at the time it was made, and the declarant must have understood the damaging potential of his statement. The

---

12. *See e.g., State v. Gervais,* 317 A. 2d 796 (Me. 1974); *People v. Lettrich,* 413 Ill. 172, 108 N.E. 2d 488 (1952); *State v. Larsen,* 91 Idaho 42, 415 P. 2d 685 (1966).

13. *People v. Spriggs,* 60 Cal. 2d 868, 36 Cal. Rptr. 841, 389 P. 2d 377 (1964); *Newberry v. Commonwealth,* 191 Va. 445, 61 S.E. 2d 318 (1950); *Hines v. Commonwealth,* 136 Va. 728, 117 S.E. 843, 35 A.L.R. 431 (1923); *Sutter v. Easterly,* 354 Mo. 282, 189 S.W. 2d 284 (1945) (civil case); *People v Edwards,* 396 Mich. 551, 242 N.W. 2d 739 (1976).

14. *State v. Higginbotham,* 298 Minn. 2, 4-5, 212 N.W. 2d 881, 883 (1973); *Brady v. State,* 226 Md. 422, 174 A. 2d 167 (1961), *affirmed,* 373 U.S. 83 (1963); *See State v. Gervais,* 317 A. 2d 796, 803 (Me. 1974); *See also Pitts v. State,* 307 So. 2d 473 (Fla. App.), *cert. dismissed,* 423 U.S. 918 (1975).

statement must have been voluntary and there must have been no probable motive for the declarant to falsify. Further, it must be shown that the declarant was in a position to have committed the crime to which he purportedly confessed.[15]

In addition to the foregoing requirements a significant number of courts impose a corroboration requirement as a prerequisite to admissibility.[16] For example, the Minnesota Supreme Court said in *State v. Higginbotham* that declarations against penal interest must be "proved trustworthy by independent corroborating evidence that bespeaks reliability." In *State v. Gardner* the requirement was "corroborating facts and circumstances surrounding the making of the declaration [which] clearly indicate that it has a high probability of trustworthiness." The rule in Idaho, as stated in *State v. Larsen*, is that an extrajudicial confession of a third party is admissible "only when there is other substantial evidence which tends to show clearly that the declarant is in fact the person guilty of the crime for which the accused is on trial."

In every case the precise application of the standards of reliability must be left to the discretion of the trial judge who, on voir dire, will weigh all the evidence and thereafter admit the declaration only if he determines there is a reasonable possibility that the declarant did indeed commit the crime. It was pointed out in *Pitts v. State*, 307 So. 2d 473 (Fla. App.), *cert. dismissed*, 423 U.S. 918 (1975), that "it would be imperative that broad discretion be afforded the trial judge in determining the reliability of the declaration and the declarant by consideration of such factors as spontaneity, relationship between the accused and the declarant, existence of corroborative evidence, whether or not the declaration had been subsequently repudiated and whether or not the declaration was in fact against the *penal interests* of the declarant. As an example, an 'admission' by one who had already admitted or been convicted of other similar crimes could hardly be said to be against his *penal* interests." *Id.* 484-485. (Nor would a declarant's out-of-court confession be against penal interest if he had been either convicted or acquitted of the crime.)

---

15. *See, e.g., Cameron v. State*, 153 Tex. Crim. 29, 31, 217 S.W. 2d 23, 24 (1949); *State v. Gardner*, 13 Wash. App. 194, 198-199, 534 P. 2d 140, 142 (1975); *Mason v. United States*, 257 F. 2d 359 (10th Cir. 1958); *Breeden v. Independent Fire Ins. Co.*, 530 S.W. 2d 769 (Tenn. 1975).

16. *See* 56 Boston L. Rev. at 172-177.

[3]  As earlier noted, this Court has not heretofore considered the admissibility of declarations against penal interest in light of the modern trend and the respectable arguments for their admission under appropriate safeguards. Having done so, we now conclude that it is in the best interests of the administration of justice that declarations against penal interest be admitted under the following conditions:[17]

(1) The declarant must be dead; beyond the jurisdiction of the court and the reach of its process; suffering from infirmities of body or mind which preclude his appearance as a witness either by personal presence or by deposition; or exempt by ruling of the court from testifying on the ground of self-incrimination. As a further condition of admissibility, in an appropriate case, the party offering the declaration must show that he has made a good-faith effort to secure the attendance of the declarant.

(2) The declaration must be an admission that the declarant committed the crime for which defendant is on trial, and the admission must be inconsistent with the guilt of the defendant.

(3) The declaration must have had the potential of actually jeopardizing the personal liberty of the declarant at the time it was made and he must have understood the damaging potential of his statement.

(4) The declarant must have been in a position to have committed the crime to which he purportedly confessed.

(5) The declaration must have been voluntary.

(6) There must have been no probable motive for the declarant to falsify at the time he made the incriminating statement.

(7) The facts and circumstances surrounding the commission of the crime and the making of the declaration must corroborate the declaration and indicate the probability of trustworthiness.

The admissibility of a declaration against penal interest will be determined by the trial judge upon a voir dire out of the presence of the jury.

---

17. For a similar review and action *see Breeden v. Independent Fire Ins. Co.*, 530 S.W. 2d 769 (Tenn. 1975).

[4] Assignments of error numbered 7 through 14 relate to the charge. Defendants contend, inter alia, that the trial judge, by "innuendo and language pushed the jury to a verdict against all four defendants"; that "the Court never realistically gave the jury the opportunity to convict less than all of the defendants and acquit one or more of the defendants"; and that he erred in failing to submit to the jury the issues of defendants' guilt of the lesser included offenses of common-law robbery and accessory after the fact to the robbery and assault. We find no merit in these contentions and no prejudicial error in the charge.

First, there is no suggestion in the charge that the judge intimated to the jury that it should find any or all of the defendants guilty. On the contrary, in a separate mandate relating to each charge and each defendant individually the judge "declared and explained the law arising on the evidence" as required by G.S. 1-180 (1966). The jury were instructed that the State must prove beyond a reasonable doubt the guilt of the named defendant or acquit "that defendant." The jury could not have understood from the court's charge that if they found one defendant guilty they would have to find all four guilty. *See State v. Tommlin*, 276 N.C. 273, 171 S.E. 2d 901 (1970).

As to the charge of common-law robbery and accessory after the fact, the rule is that the necessity for instructing the jury as to an included crime of lesser degree than that charged arises *only* when there is evidence from which the jury could find that the included crime of lesser degree had been committed. *State v. Griffin*, 280 N.C. 142, 185 S.E. 2d 149 (1971); *State v. Carnes*, 279 N.C. 549, 184 S.E. 2d 235 (1971). That rule is applicable to this case, the record in which contains no evidence of common-law robbery. All the evidence tends to show that the robbery at Jackson's Red & White Grocery was a robbery with firearms. Likewise the uncontradicted evidence of the State (which is all the evidence) tends to show that the defendants, four of the five occupants of the Watkins automobile who had traveled together during the preceding night from Washington, D.C., to Clinton, had conspired to rob the grocery and that those who did not go into the store were outside, standing by to assist those who had entered. (The defendants' brief tells us that the female occupant, Mrs. Watkins, removed herself from this case by a plea of common-law robbery.)

State v. Haywood

Defendants' remaining assignments of error, Nos. 1, 2, 3, 4, and 6, relate to the trial judge's rulings upon objections to evidence which was either competent or so inconsequential that any discussion would be good-for-nothing. These assignments are overruled.

In the trial we find

No error.

Justice BRITT took no part in the consideration or decision of this case.